2005 VT 108

## Judicial Watch, Inc. v. State of Vermont, Deborah L. Markowitz, Secretary of State, Gregory Sanford, State Archivist and Howard Dean, M.D., Former Governor

[892 A.2d 191]

No. 04-209

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed November 4, 2005
Motion for Reargument Denied December 21, 2005

*Andrew D. Manitsky* of *Gravel and Shea*, Burlington, and *Paul J. Orfanedes*, Judicial Watch, Inc., Washington, DC, for Plaintiff-Appellee.

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** We accepted this interlocutory appeal to determine whether the Secretary of State may enter into an agreement with a

retiring Governor to restrict public access to a portion of the Governor's official correspondence for a period of ten years after the Governor leaves office. We conclude that the restriction is permissible under Vermont law, and therefore reverse the trial court judgment to the contrary.

¶ 2. The material facts are largely undisputed. In preparation for his impending retirement, Governor Howard Dean entered into a memorandum of understanding with the Secretary of State regarding the archival storage of his gubernatorial papers. The memorandum, signed in early January 2003 by the Governor, the Secretary of State, and the Attorney General, states that its purpose "is to establish clear guidelines to govern public access to 'the official correspondence of the Governor'" under 3 V.S.A. § 4(a),[1] and sets forth "special terms and conditions of restriction" for any official correspondence determined by the Governor to be covered by executive privilege, under provisions of the State Archives Act, formerly codified at 3 V.S.A. § 117(a)(2) (now codified at 3 V.S.A. § 117(g)(9)).[2] The terms and conditions include the proviso that any correspondence determined by the Governor to be covered by executive privilege will be open to the public commencing on January 10, 2013, ten years hence. Until that time, the privileged records will be sealed, and accessible in only a few limited circumstances, including written authorization from Governor Dean, or "[p]ursuant to a valid court order."

¶ 3. Although the trial court made no specific findings on the volume of the records at issue, it was undisputed that the state archives acquired approximately 320 cubic feet of records from Governor Dean (one cubic foot is the equivalent of one standard-size storage box), of which approximately 150 cubic feet were designated as containing privileged material. The Governor later reduced the number of sealed gubernatorial records to approximately 93 cubic feet.

---

[1] This section provides: "The official correspondence of the governor is the property of the state. Upon retiring from office he or she shall cause such correspondence and an itemized list thereof to be deposited with the secretary of state. The secretary of state shall preserve these records in accordance with professional archival practices recommended by the state archivist."

[2] This section provides that, in fulfilling the duties of the state archives program, the state archivist shall "permit the public to inspect, examine, and study the archives, provided that any record placed in the keeping of the office of the secretary of state under special terms or conditions of law restricting their use shall be made accessible only in accord with those terms and conditions."

¶ 4. In August 2003, following Governor Dean's retirement, plaintiff Judicial Watch, Inc., a self-described "watchdog" organization based in Washington, D.C., filed a request under the Public Records Act, 1 V.S.A. §§ 315-320 (hereafter "PRA" or "Act"), to inspect and copy all of Governor Dean's gubernatorial papers. The Secretary denied the request for access to the records that had been sealed pursuant to the memorandum of understanding, noting that they were governed by the provision of the State Archives Act applicable to archived records and the "special terms or conditions" attached thereto, under 3 V.S.A. § 117(g)(9), rather than by the PRA. Plaintiff then filed this action in superior court, seeking to compel the Secretary to comply with its PRA request. The State answered and filed a counterclaim, seeking a declaration that the Governor's records were validly sealed under the memorandum of understanding and not subject to disclosure under the Act.

¶ 5. Plaintiff subsequently moved for judgment on the pleadings. The State opposed the motion, arguing that plaintiff had failed to demonstrate as a matter of law that the memorandum of understanding was invalid, and asserting that the case should be decided on the basis of summary judgment following additional factual development. The trial court issued an initial decision in February 2004, concluding that the Archives Act did not authorize the Secretary to restrict access to records deemed to be privileged by Governor Dean; that the records in question were governed by the PRA; and that, as this Court has recognized, a prima facie claim of executive privilege under the Act's exception for "common law privilege," 1 V.S.A. § 317(c)(4), requires a showing specifically identifying the document in question and the basis for the privilege. See *New England Coalition v. Office of the Governor*, 164 Vt. 337, 344, 670 A.2d 815, 820 (1995) ("The executive must specifically identify the documents for which the privilege is claimed, and must explain why the documents are protected by the privilege."). The court then set forth a tentative process for adjudicating any claims of executive privilege that the State might choose to assert with respect to specific documents in the archived records.

¶ 6. The State moved for reconsideration of the court's decision or, in the alternative, for permission to file an interlocutory appeal. The State also submitted a memorandum addressed to the proposed process for adjudicating executive privilege claims. The State's memorandum included a request for an order requiring plaintiff to pay the estimated $18,900 in staff costs that would be incurred in creating a guide to the sealed documents, and the estimated $168,750 in costs for summarizing

the contents of the documents. Plaintiff filed a consolidated response to the State's motion and memorandum. In May 2004, the trial court issued a second decision, denying the State's motion for reconsideration and request for payment of staff costs, but granting the motion for interlocutory appeal. We accepted review to address an issue of significant public interest and importance.

¶ 7. While we recognize the competing public-policy interests vigorously advanced by the parties in this case, the issue — in our view — turns principally on statutory language and meaning. See *In re Huntley*, 2004 VT 115, ¶ 6, 177 Vt. 596, 865 A.2d 1123 (mem.) (in determining statutory meaning, we are guided by the Legislature's intent as evidenced principally by the language of the statutes themselves). The PRA provides a broad right of access to public records, qualified by a list of specific exceptions that must be strictly construed in favor of disclosure. *Springfield Terminal Ry. v. Agency of Transp.*, 174 Vt. 341, 345, 816 A.2d 448, 452 (2002). The State Archives Act, 3 V.S.A. § 117, confers broad authority on the Secretary of State, through the division of state archives, to implement and administer an archival management program, *id.* § 117(b), identify and take custody of "archival records" of "continuing legal, administrative, or historic value," *id.* § 117(a)(2), preserve such records for "their use by government officials, educators, historians, and the public," *id.* § 117(g)(8), and "permit the public to inspect, examine, and study the archives, provided that any record placed in the keeping of the office of the secretary of state under special terms or conditions of law restricting their use shall be made accessible only in accord with those terms and conditions," *id.* § 117(g)(9). Retiring governors are required by statute to deposit their "official correspondence" with the Secretary of State for preservation in the archives. *Id.* § 4(a).

¶ 8. It is axiomatic that "[i]n construing conflicting statutes that deal with the same subject matter, the more specific provision controls over the more general one." *Stevenson v. Capital Fire Mut. Aid Sys., Inc.*, 163 Vt. 623, 625, 661 A.2d 86, 88 (1995) (mem.); accord *State v. Benoir*, 174 Vt. 632, 633, 819 A.2d 699, 702 (2002) (mem.). Although it is undisputed that a governor's official correspondence falls within the general scope of public records subject to the PRA, it is also apparent that these materials represent a specific subset of public records subject to more precise statutory control. As noted, a distinct provision, 3 V.S.A. § 4(a), requires that retiring governors deposit their official correspondence with the Secretary of State for archival preservation, and the Archives Act specifically states that archived materials "placed

in the keeping of the office of the secretary of state under special terms or conditions of law restricting their use shall be made accessible only in accord with those terms and conditions." *Id.* § 117(g)(9). Thus, notwithstanding the general right of access to public records under the PRA, the more specific and exacting legislative requirements that a retiring governor's official correspondence be placed in the state archives and that such records be made "accessible only in accord with" the special terms or conditions restricting their use must control. The statutes, in short, evince an express legislative intent to authorize the "special term" restricting access to the former Governor's archived records.

 ¶ 9. Our reading of the statutory text finds additional support in two external sources. See *In re Hinsdale Farm*, 2004 VT 72, ¶ 5, 177 Vt. 115, 858 A.2d 249 (legislative history and circumstances surrounding statute's enactment may be helpful in discovering legislative intent); *State v. Ben-Mont Corp.*, 163 Vt. 53, 57, 652 A.2d 1004, 1007 (1994) (in determining legislative intent, court may look to statutory framework and history). First, although the legislative history is limited, we note that the principal witness in support of the Archives Act, state archivist Gregory Sanford, testified before the Senate Government Operations Committee that the primary purpose of the legislation was to "recognize the current realities" of archival records and management, to reflect current practices, and to give "explicit recognition of archival programs" then in existence. Hearing on H. 338 Before Senate Comm. on Gov't Operations, 1989-1990 Bien. Sess. (Vt. Apr. 18, 1990) (Statement of Gregory Sanford). In an affidavit in support of the State's motion for reconsideration, William Dalton, the Deputy Secretary of State, stated without dispute that prior to the enactment of the Archives Act in 1990, the Secretary had received official gubernatorial papers from retiring Governors Deane C. Davis in 1973, and Thomas P. Salmon in 1976, in each case conditioned on a two-year restriction on public access. The legislative history thus supports the conclusion that one purpose of the Archives Act was to codify the Secretary's longstanding practice — separate and apart from any limitations contained in the PRA — of accepting retiring governors' official papers with broad restrictions on public access for periods of years.

¶ 10. A second consideration in our interpretation of the statutes is the Secretary of State's longstanding construction and implementation of the Archives Act. "Absent compelling indications of error, interpretations of administrative regulations or statutes by the agency respon-

sible for their execution will be sustained on appeal." *In re Capital Inv., Inc.*, 150 Vt. 478, 482, 554 A.2d 662, 665 (1988). The record here reveals that within months of the enactment of the Archives Act, then-Secretary of State James H. Douglas entered into an agreement with outgoing Governor Madeleine Kunin for receipt of her official correspondence. Like the memorandum at issue here, the agreement restricted public access to those papers designated by the Governor as covered by executive privilege.[3] In so doing, the agreement specifically referenced the recently enacted provision of the Archives Act, now codified at 3 V.S.A. § 117(g)(9), providing that records placed with the Secretary "under special terms or conditions of law restricting their use shall be made accessible only in accord with those terms and conditions." In 1992, Secretary Douglas entered into a similar agreement to restrict public access for six years to the papers of the late Governor Richard A. Snelling, again referencing the "special terms or conditions" provision of the Archives Act.

¶ 11. Thus, since its inception, the Secretary of State's practice under the Archives Act has been to accept gubernatorial papers subject to special terms or conditions broadly and independently limiting access to materials designated by the outgoing governor as privileged. The administering agency's interpretation of the statute is consistent with its plain language and legislative history, and is therefore entitled to substantial deference. See *State v. Int'l Collection Serv., Inc.*, 156 Vt. 540, 545-46, 594 A.2d 426, 430 (1991) (we give "substantial deference" to interpretation of agency charged with administration of statute). Together, these sources definitively demonstrate the statutory validity of the special term limiting access to the gubernatorial papers at issue here. The trial court's conclusions that the ten-year restriction violated the PRA, and that the State was separately required under the Act to make a specific prima facie showing of executive privilege for each document in question, were therefore erroneous.

¶ 12. Plaintiff's several arguments to the contrary are not persuasive. First, plaintiff argues that giving effect to the memorandum of understanding would contravene decisional law from Vermont and across the country. The argument is premised on cases holding that confidentiality provisions in litigation settlement agreements or collective bargaining contracts cannot override public records acts.

[3] The agreement provided for a six-year moratorium on public access, subject to exceptions for "a valid court order" or written authorization from Governor Kunin.

See, e.g., *Trombley v. Bellows Falls Union High Sch. Dist. No. 27*, 160 Vt. 101, 107, 624 A.2d 857, 862 (1993) (labor contract providing for confidentiality of grievances "cannot override the provisions of the Public Records Act"); *Anchorage Sch. Dist. v. Anchorage Daily News*, 779 P.2d 1191, 1192-93 (Alaska 1989) (confidentiality provision in settlement agreement between school district and plaintiff was unenforceable under public records act); *State of Haw. Org. of Police Officers v. Soc'y of Prof'l Journalists*, 927 P.2d 386, 412-14 (Haw. 1996) (provision in collective bargaining agreement to maintain confidentiality of disciplinary actions against members of police department violated public records law); *Tribune-Review Publ'g Co. v. Westmoreland County Hous. Auth.*, 833 A.2d 112, 118 (Pa. 2003) (confidential settlement agreement between housing authority's insurer and its former employee can not override freedom of information statute). Our holding here, however, is not that the ten-year restriction in the memorandum of understanding trumps the PRA, but that it is separately authorized and controlled by the Archives Act. Accordingly, these decisions are inapposite.

¶ 13. Plaintiff further contends that the memorandum of understanding encroaches on the authority of the legislative and judicial branches, in violation of the constitutional principle of separation of powers. Vt. Const. ch. II, § 5. The contention assumes that the PRA controls the disposition of a retiring governor's official correspondence, an argument that we have rejected. Plaintiff also relies on the language of the Archives Act, asserting that the phrase "special terms or conditions of law" in 3 V.S.A. § 117(g)(9) refers solely to pre-existing "legal" or statutory restrictions on access to documents set forth in the PRA or other statutes. Thus, plaintiff asserts that only a properly adjudicated claim of executive privilege under the PRA qualifies as a "special term or condition of law."

¶ 14. Plaintiff's argument requires reading the statute to create two essentially identical types of restriction: "special terms" of *law*, and "conditions of *law*." Plaintiff offers no explanation, however, as to why the Legislature would create a superfluous category. See *In re Dunnett*, 172 Vt. 196, 199, 776 A.2d 406, 409 (2001) (when interpreting a statute, we will not construe it in a way that renders language surplusage); *State v. Phillips*, 142 Vt. 283, 286 n.1, 455 A.2d 325, 327 n.1 (1982) (declining to construe two statutory clauses as "synonymous" where it would render one "mere surplusage"). More to the point, the Legislature wrote the statute in the disjunctive, referring to "special terms *or* conditions of law," which under normal rules of construction suggests

two alternative and distinctive types of restrictions, "special terms" and "conditions of law." See *Firefighters of Brattleboro v. Brattleboro Fire Dep't*, 138 Vt. 347, 351, 415 A.2d 243, 245 (1980) (use of disjunctive in statute implies separate and independent categories); *Sparkman v. McClure*, 498 So. 2d 892, 895 (Fla. 1986) (use of disjunctive "or" in statute "normally indicates that alternatives were intended"); *Holzman v. Fiola Blum, Inc.*, 726 A.2d 818, 834 (Md. Ct. Spec. App. 1999) (""or" ... is normally disjunctive and establishes a relationship of contrast'" (quoting *Parrish v. Dist. of Columbia*, 718 A.2d 133, 135 (D.C. 1988)). "Conditions of law" is a common reference to existing legal authority, such as the PRA,[4] while "special terms" — in contrast — suggests precisely the kind of individually crafted and negotiated restrictions at issue here. See Random House Unabridged Dictionary 1831 (2d ed. 1987) (defining "special" as "particular, individual, or certain"). Plaintiff's proposed construction, therefore, is incompatible with the natural sense and structure of the statutory text. See *Rhodes v. Town of Georgia*, 166 Vt. 153, 157, 688 A.2d 1309, 1311 (1997) (statutory language should be accorded "natural and logical" meaning).

¶ 15. The trial court also relied on a provision in the memorandum of understanding stating that the sealed documents would be made accessible in limited circumstances, including "[p]ursuant to a valid court order." The court inferred that the exception was intended to incorporate the adjudicative requirements for establishing an executive-privilege claim under the PRA. See *New England Coalition*, 164 Vt. at 344, 670 A.2d at 820 (proponent of executive privilege must establish prima facie case, specifically identifying document and reasons for privilege). The trial court's inference, however, virtually negates the otherwise clear intent of the parties to the agreement to create a broad restriction on access to privileged documents under the separate authority of the Archives Act. The court-order exception more logically contemplates circumstances in which a court has been persuaded that countervailing interests compel disclosure of otherwise privileged documents. See, e.g., *State v. Barbera*, 2005 VT 13, ¶ 10, 178

---

[4] See, e.g., *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003) (noting that courts may decline to apply law of the case doctrine "because of changed conditions of law"); *West v. Forehand*, 195 S.E.2d 777, 780 (Ga. Ct. App. 1973) (statutes are presumed to be enacted by legislature with full knowledge of existing conditions of law); *Driscoll v. Harris County Comm'rs Court*, 688 S.W.2d 569, 574 (Tex. App. 1984) ("[A]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing conditions of the law and with reference to it.").

Vt. 498, 872 A.2d 309 (mem.) (recognizing that in some circumstances the due process rights of criminal defendants may require access to privileged information about alleged victim); *Killington, Ltd. v. Lash*, 153 Vt. 628, 638-39, 572 A.2d 1368, 1374-75 (1990) (established claim of executive privilege may be overcome where evidence is essential to defendant's right to fair trial or demonstration of alleged governmental wrongdoing). We do not, therefore, interpret the exception to swallow the rule. Nor does the record disclose that plaintiff has claimed or demonstrated a specific interest sufficiently compelling to warrant a court order overriding the otherwise privileged documents under the memorandum of understanding.

¶ 16. Finally, plaintiff asserts that a construction of the Archives Act permitting retiring governors to broadly restrict access to official correspondence that would otherwise have been open to the public during their terms of office (subject to a particularized showing of executive privilege under the PRA) is illogical and absurd. We have recognized the rule of construction that statutes should not be interpreted to produce "absurd or illogical" results. *Rhodes*, 166 Vt. at 157, 688 A.2d at 1311. The rule does not, however, provide a license to substitute this Court's policy judgments for those of the Legislature. As the leading authority on statutory construction has cautioned, "the absurd results doctrine should be used sparingly because it entails the risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could not have meant what it unmistakably said." 2A N. Singer, Statutes and Statutory Construction § 46.07, at 199 (6th ed. 2000). Thus, as one court has cogently explained, the doctrine merely permits an otherwise reasonable construction when a plain reading of the statute "would produce a result demonstrably at odds with any conceivable legislative purpose." *Taylor-Hurley v. Mingo County Bd. of Educ.*, 551 S.E.2d 702, 710 (W. Va. 2001); see also *Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶ 11, 175 Vt. 61, 819 A.2d 727 (declining to reinterpret terms of statute under absurd results doctrine where plain reading would not cause it to "fail in its essential purpose").

¶ 17. That is plainly not the case here. Although the legislative history is limited, the Secretary of State's office — in construing and applying § 117(g)(9) of the Archives Act to permit general restrictions on gubernatorial papers — has consistently maintained that it "strike[s] a balance" between the public interest in preserving a full and complete record of a retiring governor's administration for the benefit of future historians and the general public, and the governor's

interest in deferring — for some period of time — access to historical documents deemed sensitive or subject to executive privilege. See *Int'l Collection Serv.*, 156 Vt. at 545-46, 594 A.2d at 430 (administering agency's interpretation of statutory meaning entitled to substantial deference). The critical importance of broad access to an incumbent governor's records to ensure public accountability cannot be doubted. Yet the Legislature could also rationally conclude that the public interest in access to a former governor's correspondence is not so urgent or compelling that it could not be deferred for some period of time by a general restriction on a portion of the records. We note, in this regard, that other jurisdictions have enacted statutes expressly authorizing retiring chief executives to limit access to their official papers for periods in excess of the ten-year restriction at issue here. See 44 U.S.C. § 2204(a)(5) (under Presidential Records Act, outgoing President may specify durations, "not to exceed 12 years," restricting access to designated confidential papers); Cal. Gov't Code § 6268 (upon leaving office, governor may, by written instrument, restrict access to public records transferred to archives for period not in excess of "50 years or the death of the Governor, whichever is later"); Kan. Stat. Ann. § 75-104(e) (subject to certain exceptions, access to former governor's papers prohibited during "the lifetime of the former governor" except upon his or her consent). Accordingly, we discern no merit to plaintiff's claim that upholding the restriction in this case would lead to absurd or illogical results.

¶ 18. On a variation of the same theme, plaintiff contends that it would be absurd to construe the Archives Act to permit the ten-year restriction on portions of Governor Dean's correspondence because the statute, by its terms, does not expressly limit the extent or duration of restrictions by future governors. Thus, plaintiff argues, a future governor could utterly defeat the public interest in disclosure by negotiating a permanent restriction on all of his or her official correspondence. While such a case is not before us, we note that the statute refers to archived records under terms or conditions "restricting" — not prohibiting or foreclosing — their use. See Random House Unabridged Dictionary, *supra*, at 1642 (defining "restrict" as "to confine or keep within limits"). Moreover, as discussed, the legislative history of the Archives Act suggests that its purpose was to codify past practice based on restrictions of limited scope and duration, and its implementation has been consistent with this purpose. Accordingly, we perceive no basis to speculate that the statute will invite future abuse, although the Legislature obviously remains free to require more

specific or limited terms of restriction on access to gubernatorial papers if it perceives such a need.

¶ 19. For all of the foregoing reasons, we conclude that the trial court erred in invalidating the special term of the memorandum of understanding restricting access to designated portions of former Governor Dean's official correspondence in the state archives. Our conclusion renders it unnecessary to address the State's remaining claims concerning the proper allocation of staff costs for the creation of a document index under the PRA.

*Reversed.*

¶ 20. **Dooley, J.,** concurring. I find this a very close case, but I am ultimately persuaded by the history and the legislative history to vote for the result reached by the majority. My unease with the decision, however, is caused by the loose and vague drafting of the statutes upon which we are relying, compounded by the difficulty in responding under the Public Records Act to a request for 550,000 to 600,000 pages of records. I believe the Legislature should act to correct the deficiencies in the State Archives Act and the Public Records Act, and write to express my concerns.

¶ 21. The statute on which our decision relies permits "the public to inspect, examine, and study the archives, provided that any record placed in the keeping of the office of the secretary of state under special terms or conditions of law restricting their use shall be made accessible only in accord with those terms and conditions." 3 V.S.A. § 117(g)(9). The majority holds that the restrictions on access contained in the memorandum of understanding between the former Governor, the Secretary of State, and the Attorney General are "special terms" within the meaning of the statute.

¶ 22. Nonetheless, the statutory language remains vague and gives little guidance as to what boundaries, if any, this or another court should give to such terms. The records sought by plaintiff are the "property of the state," and the outgoing Governor is required to make "an itemized list" of the records and deposit them with the Secretary of State. 3 V.S.A. § 4(a). Nothing in that statute states that the outgoing Governor can condition or restrict public access to these state records. See *id.* Moreover, although in this case Governor Dean and the Secretary of State had an agreement on public access with respect to the records in question, nothing in the words "special terms" suggests an agreement is necessary to restrict access. 3 V.S.A. § 117(g)(9). Nor

does the statutory language clarify who can or cannot unilaterally set these terms in the absence of an agreement. *Id.*

¶ 23. Further, nothing in the statute suggests that there is any limit on the "special terms" that are imposed. The majority suggests that a limit might be found in the words "restricting their use," apparently on the theory that a prohibition is not a restriction. 3 V.S.A. § 117(g)(9). But under this theory, a long closure period — for example, for fifty years — would be a restriction and not a prohibition. Moreover, the terminology of this phrase "restricting their use" is itself an example of loose drafting because it speaks of restriction on "use" and not "access." *Id.* In fact, it was the wording of this phrase that led the trial judge to rule that 3 V.S.A. § 117(g)(9) does not authorize a restriction on "access" but only a restriction on "use."

¶ 24. Nor does the statutory language require a "special term" to implement exceptions to public access under the Public Records Act. In this case, Governor Dean has claimed that the records withheld from public access fall within executive privilege, but nothing in the language of 3 V.S.A. § 117(g)(9) actually requires any documents be subject to executive privilege, or any other special requirement, before special terms can be made to restrict their use. In this case, although Governor Dean claims executive privilege, we have no way of determining the validity of that claim because no review is possible. Certainly, the quantity of records being withheld suggests a great risk that the claim of executive privilege is overbroad. Regardless, even if a record requester could identify a particular record with specificity, and prove an executive privilege claim to be invalid, the agreement would nonetheless continue to prevent public access to the record during the ten-year period because the statutory language does not require that executive privilege actually be applicable. My main point is, however, that under the current statute the Governor could delay access merely to avoid embarrassment, not because he has a legitimate public records exception claim, and that delay would still be valid under the statutory terms.

¶ 25. Finally, while it is tempting to see this dispute as unusual, even unique, the ramifications of our decision are not. The State Archives Act applies to any archival records, defined broadly as public records "which have continuing legal, administrative, or historic value." *Id.* § 117(a)(2). Under this definition, almost any public record is an archival record, whether or not the Governor had anything to do with

it.[5] Thus, under the statute as we have interpreted it, someone — it remains uncertain who that someone is — might be able to deny public access to any record if it found its way into the division of Vermont state archives with a special term restricting access.

¶ 26. There are equally serious deficiencies in the coverage of the Public Records Act. After this decision regarding the State Archives Act, the records requester can avoid possible future access restrictions by simply making a public access request while the Governor is still in office. Given the nature of campaigns for national office, it was apparent at the end of Governor Dean's term that he would campaign for national office, and the request we are dealing with was initiated by a simple letter. See *Herald Ass'n, Inc. v. Dean,* 174 Vt. 350, 351, 816 A.2d 469, 471 (2002) (press sought Governor's travel schedule of trips "related to his bid for the United States presidency" before he left office). A future letter requesting access must only be initiated before the Governor, or another figure, has the ability to utilize the "special terms" provision in the State Archives Act.

¶ 27. We are dealing with between 550,000 and 600,000 pages of documents. The record doesn't tell us how many separate documents this represents, but it is obvious the number is staggering. The cost and time of cataloging, describing, and claiming exemption (or not) for these documents is equally staggering. The Deputy Secretary of State estimated that the staff time necessary to catalog and create a summary description of the sealed documents was over 4200 hours. This did not include the time necessary to create the assertion of privilege or exemption for each document or the time to litigate any resulting disputes.

¶ 28. The Public Records Act provides that even in exceptional cases a ruling on a record request must be made within twelve business days.

---

[5] In spite of the broad definition, most public records end up in the custody of the Commissioner of Buildings and General Services pursuant to chapter 11 of Title 22, 22 V.S.A. §§ 451-457. For example, the vast majority of judiciary case records have gone to the Commissioner and not to the Secretary of State, although they have continuing "legal" value. See Vermont Judicial Records Program: Vermont Archival Judicial Records (ninety-six boxes of Vermont judicial records are archived with the Secretary of State, while 13,500 cubic feet of judicial records are stored at the Vermont Records Center operated by the Commissioner of Buildings and General Services), available at http://vermont-archives.org/records/vjrp/reports/vtcomp.htm (last visited Oct. 31, 2005). Presumably, the Public Records Act and, in the case of the judiciary, the Rules for Public Access to Court Records, governs public access to these records. But, even this conclusion is debatable under the vague statutes.

1 V.S.A. § 318(a)(5). Obviously, a bulk records request of the magnitude involved here cannot be answered completely and accurately within the statutory time limit, even if the Governor and his or her entire staff did nothing but examine, catalog, and review records between the time of request and the date of decision.

¶ 29. The State argued here that plaintiff, Judicial Watch, should be required to pay up-front the cost of the staff time to catalog and describe the records, a cost initially estimated to approach $115,000, and then to reimburse the state for the cost of presenting a written justification of each claim of executive privilege. The superior court denied this request because the statute allows the state to "charge and collect the cost of staff time associated with complying with a request for a copy of a public record." 1 V.S.A. § 316(c). The court held that the statute did not allow the state to charge staff time to resist public access: "Such an expansive interpretation could cripple cumbersome requests with unnecessarily high expenses. That the legislature could not possibly have intended; the Act is designed to encourage access, not to thwart it."

¶ 30. It is impossible to estimate the time and cost that would be expended to litigate claims of executive privilege and other public access exemptions in records of this type and number. Certainly, our decisions on executive privilege make clear that a complex judgment, affected by a number of factors, must be made on each record. See, e.g., *Herald Ass'n, Inc.*, 174 Vt. at 356-57, 816 A.2d at 475-76 (claim of executive privilege as to a document must be supported by an affidavit "based on 'actual personal consideration' by the responsible official" and the official must make the determination based on the information in the document so that partial disclosure is possible) (internal citations omitted); *New England Coalition v. Office of the Governor*, 164 Vt. 337, 343-45, 670 A.2d 815, 819-20 (1995) (same); *Killington, Ltd. v. Lash*, 153 Vt. 628, 637-41, 572 A.2d 1368, 1374-76 (1990) (same). Such decisions do not portend speedy adjudication. Yet, 1 V.S.A. § 319(b) regarding public record access provides:

> (b) Except as to cases the court considers of greater importance, proceedings before the superior court, as authorized by this section, and appeals therefrom, take precedence on the docket over all cases and shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way.

Further, as a case such as this will generally arise because a requester seeks to use disclosed records as soon as possible in the political debate, only a speedy resolution of the issue is acceptable.

¶ 31. I do not think the Legislature has come to grips with a record request of this magnitude. The time limits in the statute are wholly unrealistic for a request of this type, and however we might have ruled on the dispute over funding to comply with the statutory mandate, we would have been extrapolating from the statutory language to a situation not clearly covered by the statute.

¶ 32. It would be easy for us to say that the circumstances that created this dispute are unique and are not likely to recur once we announce this decision. I think such a reaction would be shortsighted and overly optimistic. Indeed, the exposure from this controversy may make future requests and cases more likely. While I agree with the majority decision based on the statutes we are required to implement, I don't think that the answers in future cases are predictable based on the current state of these statutes. I urge the Legislature to review and clarify them so we have a clear road map for the future.