2014 VT 121

## State of Vermont v. Brian Grenier

## State of Vermont v. Jessica Harris

[110 A.3d 291]

Nos. 13-224 & 13-300

Present: **Reiber, C.J., Dooley, Skoglund and Crawford, JJ.,[1] and Morse, J. (Ret.), Specially Assigned**

Opinion Filed November 14, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Gregory Nagurney*, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

*David C. Sleigh* and *Kyle L. Hatt* of *Sleigh Law*, St. Johnsbury, for Defendants-Appellants.

¶ 1. **Reiber, C.J.** These consolidated cases stem from defendants Brian Grenier and Jessica Harris's prosecutions for driving under the influence (DUI).[2] Defendants appeal the trial court's denial of

---

[2] The consolidated case below included seven defendants, only two of which remain in this appeal.

their motions to suppress the results of their breath-alcohol tests taken by the DataMaster DMT machine. For the following reasons, we affirm the trial court.

¶ 2. We begin with the procedural history. Defendants Grenier and Harris were arrested for driving under the influence on May 22, 2010 and February 8, 2011, respectively. Defendants moved to suppress the evidentiary breath-alcohol test results, arguing (1) that the Vermont Commissioner of Health (Commissioner) did not approve the DataMaster DMT machine used to obtain the breath-alcohol results, as required by 23 V.S.A. § 1203(d) and rules adopted by the Vermont Department of Health (DOH); and (2) that admission of the DMT results would violate defendants' due process rights under the United States and Vermont constitutions because of alleged ongoing mechanical problems with the machines and unprofessional practices by DOH employees.[3] Defendants requested an evidentiary hearing on their claims.

¶ 3. The Washington Unit Criminal Division denied defendants' motions to suppress on September 16, 2011. The court declined to hold an evidentiary hearing, finding it unnecessary because, even taking defendants' allegations as true, the parties did not dispute the relevant material facts. The court ruled that the DataMaster DMT was properly approved by the DOH for use as a breath-testing device, based on letters issued by the DOH Commissioner in 2006 and 2010 approving "the DataMaster using infrared technology" for evidentiary use. The court rejected defendants' arguments that the approval was inadequate because it was not specific to the DataMaster DMT, reasoning that based on the language of § 1203(d) and this Court's case law interpreting the statute, the Legislature did not require such a specific approach. The court also rejected defendants' arguments that admission of the test results would violate their due process rights because their allegations against the DOH would be adequately tested through the adversarial system and did not need to be resolved on a motion to suppress.

¶ 4. On October 11, 2012, defendants filed motions for reconsideration with additional evidence not before the trial court at

---

[3] As of March 1, 2012, the breath-alcohol testing program, including adoption of breath-testing rules, has been administered by the Department of Public Safety instead of the Department of Health. 2011, No. 56, §§ 14, 28(1). For purposes of this opinion, we cite to the legal framework as it existed at the time of defendants' offenses.

the time of its initial decision. Defendants continued to assert that the DataMaster DMT was not approved in accordance with DOH rules, but argued further that (1) the initial 2006 approval letter could not have covered the DMT model because the State had not yet formally purchased the DMT machines at the time the letter was issued; and (2) the Commissioner issued the 2010 approval letter without due diligence, but merely as a rote response to a state's attorney's request. The court considered this new evidence, but affirmed its prior ruling that the Commissioner approved the DataMaster DMT in accordance with DOH rules.

¶ 5. At trial, defendants vigorously attacked the reliability of the test and urged the jury to give it no weight. In particular, defendants relied on evidence of ongoing technical problems with the machines and of unprofessional conduct within the DOH, allegations that a subsequent internal investigation determined to be unfounded. Defendant Grenier was convicted by a jury of DUI, and defendant Harris pled guilty to the same charge, but conditioned on her appeal of the trial court's rulings. On appeal, defendants argue that the trial court abused its discretion in denying defendants' requests for an evidentiary hearing and that it erred in denying defendants' motions to suppress.

## I.

¶ 6. Some further elaboration on the factual background is necessary to provide context to defendants' arguments. Our understanding of defendants' allegations is informed substantially by the trial court's factual findings, to which we defer on appeal. *State v. Burnett,* 2013 VT 113, ¶ 14, 195 Vt. 277, 88 A.3d 1191 (stating that this Court defers to trial court's factual findings on appeal from denial of motion to suppress); see also *State v. Zaccaro,* 154 Vt. 83, 86, 574 A.2d 1256, 1258 (1990) (stating that when reviewing denial of suppression motions, "[w]e will not disturb the trial court's findings of fact unless they are unsupported by the evidence or clearly erroneous."). We recite these facts with the important caveat that, like the trial court, we assume — without deciding — the truth of defendants' allegations for purposes of our decision.

¶ 7. In 1991, the DOH deployed its first fleet of DataMaster machines, all BAC models, for use in DUI cases. This marked a transition from the gas-chromatography technology the State had previously used to the more modern method of infrared

spectrophotometry. In 2005, however, the DOH began evaluating new models to replace the aging DataMaster BAC machines, motivated by increasing difficulty in repairing the machines and by the availability of a grant through the Governor's Highway Safety Program to purchase new machines. The DOH considered four competing brands, and ultimately settled on the DataMaster DMT because of its preferable features, satisfactory results from initial performance testing, and the DOH's good working relationship with the manufacturer. The parties do not appear to dispute that the DMT model uses the same underlying infrared-spectrophotometry technology as the BAC model, but that it uses distinct detector technology, electronics, calibration and certification techniques, and a different software operating system from the BAC model. They disagree about the legal significance of these differences.

¶ 8. On February 7, 2006, the Commissioner issued a letter entitled "Approval of Instrumentation and Procedures," which stated that "[t]he instrumentation approved for the analysis of breath alcohol for evidentiary purposes is the DataMaster using infrared technology." The letter explained that it was issued pursuant to DOH regulations requiring that "analytical instrumentation and analytical procedures for blood alcohol analysis shall be approved by the Commissioner of Health." The letter named only the DataMaster brand and did not differentiate between the BAC and DMT models. In May 2006, the DOH purchased an initial order of twenty DataMaster DMT machines. According to defendants, the initial fleet had technical problems — including one machine that emitted plumes of smoke when turned on — and all ten devices in the first shipment had to be returned to the manufacturer. The DMT machines exhibited continuing technical issues between 2006 and 2008, including failure to run routine performance checks in compliance with specifications, problems with how tickets printed in response to prompts for a second breath test, failure to report errors when the simulator solution was out of range, and other problems. In 2008, both the DOH chemist who tested the machines and the machines' software engineer concluded that Vermont's DMT machines were not ready to be deployed in the field. The problems continued, and in 2009 two of the DOH chemists recommended purchasing machines from a competing brand. Ultimately, however, the DOH purchased more DMT machines, and the machines were deployed for

evidentiary use in late 2009 and 2010. On September 24, 2010, the Commissioner issued another approval letter stating that "[t]he instrumentation approved for the analysis of breath alcohol for evidentiary purposes is the DataMaster using infrared technology." Like the 2006 letter, the 2010 letter did not distinguish between different models made by the DataMaster brand.

¶ 9. Beyond these technical problems, defendants presented the deposition testimony of two DOH chemists that questioned the competence and ethics of the DOH technician in charge of maintaining the DMT machines, as well as the veracity of the documentation demonstrating the reliability of the DMT machines. In particular, the DOH chemists testified that the technician would change his testing methodology when inspecting a malfunctioning machine and falsify data in order to get the machine to pass certification. According to the chemists, the technician would, for example, add acetone to the solution that detects interfering compounds, raise the temperature of a simulator in order to negate an out-of-range report, and fail to perform suck-back tests on instruments with broken valves. He would also fail to adequately document repairs and adjustments made to DMT machines in the field.

¶ 10. In response to the DOH chemists' complaints, the lab director in charge of the breath-alcohol testing program commissioned an internal investigation in 2010. The investigator, another DOH employee, examined the machines and the processes for maintaining them in Washington and Franklin counties and summarized his findings in a two-page memo dated July 29, 2010. He found that some of the machines had problems relating to low simulator solution concentrations and other instrument-related issues, but ultimately concluded that the methods used to resolve technical issues with the DMT machines are "an evolving process and the allegation of unethical practices is inappropriate and unwarranted." Defendants questioned the integrity of the internal investigation, believing it to be superficial and nonresponsive to the chemists' complaints, but the trial court found no basis to question the investigation's results.

## II.

¶ 11. With that background, we turn to the issues defendants raise on appeal. Defendants contend that the trial court erred in denying defendants an evidentiary hearing on disputed issues of

material fact, and that the court erred in determining that the DataMaster DMT was properly approved by the DOH Commissioner.[4]

## A.

¶ 12. ▮ First, we address the trial court's denial of an evidentiary hearing, which we review for abuse of discretion. V.R.Cr.P. 47(b)(2) (stating that decision whether to hold oral argument on motion is in discretion of trial court); *State v. Senecal*, 145 Vt. 554, 560-61, 497 A.2d 349, 352 (1985). We have previously explained that "[a] hearing on a motion is not required unless the motion papers 'indicate a real dispute for one or more relevant facts.'" *Senecal*, 145 Vt. at 560, 497 A.2d at 352 (quoting Reporter's Notes, V.R.Cr.P. 47(b)(2)). Moreover, "the failure to hold an evidentiary hearing does not deny due process rights unless substantial factual issues exist." *State v. Tongue*, 170 Vt. 409, 413, 753 A.2d 356, 359 (2000) (quotation omitted).

¶ 13. ▮ Here, the trial court did not abuse its discretion in denying an evidentiary hearing because there were no disputed issues of relevant fact. The court took defendants' allegations as true for purposes of its decision, and resolved their claims on purely legal grounds. As to the DOH approval letters, defendants and the State agreed on many, though not all, of the underlying facts, including that approval letters were issued by the Commissioner in May 2006 and September 2010, and that there were various technological differences between the BAC and DMT models. Whatever factual disagreements they did have were inapposite to the grounds for the court's decision, as the court ultimately deferred to the agency's interpretation that the approval of the breath-testing technology did not have to be specific to the model used, thus rendering defendants' arguments regarding the differences between the models irrelevant.

¶ 14. Beyond defendants' arguments about whether the DMT model was properly approved, which the court resolved on legal grounds, there were some hotly-disputed facts regarding defendants' allegations of incompetence and unethical behavior within the

---

[4] Defendants also argued below that the admission of the breath-alcohol test results violated their right to due process under the United States and Vermont constitutions. Because defendants do not raise this issue on appeal, we do not reach it.

DOH. The trial court recognized this, noting that "there is a difference in opinion among experts on the reliability of Vermont's DMT machines and the effectiveness of the DOH's maintenance procedures." It is important, however, that defendants' allegations were aimed at attacking the functioning of the DOH alcohol program generally. They did not specifically relate to the ability of the actual DMT machines used in defendants' cases to meet the performance standards promulgated by the DOH at the time their breath-alcohol was measured, as required by statute to establish the admissibility of the evidence at trial. See 23 V.S.A. § 1203(d) (providing that test results are "valid" if performed according to DOH performance standards); *State v. Rolfe*, 166 Vt. 1, 11-12, 686 A.2d 949, 956-57 (1996) (interpreting term "valid" in § 1203(d) to establish threshold of admissibility of test into evidence). In other words, defendants' allegations did not contest the foundational facts justifying admission of the test results; their arguments went solely to the weight of the evidence. See *Rolfe*, 166 Vt. at 3, 686 A.2d at 952 (holding that defendant may contest foundational facts but not otherwise challenge admissibility of test results).

¶ 15. Because defendants' allegations were speculative as applied to the functioning of the DMT machines in their particular cases, they did not present an issue of fact pertinent to the legal question of the test results' admissibility. Therefore, the court properly found an evidentiary hearing unnecessary, noting that the development of evidence at trial regarding the machine's reliability would provide a sufficient opportunity for the "adversary system to uncover, recognize, and take due account of the DOH's shortcomings." Cf. *Senecal*, 145 Vt. at 561, 497 A.2d at 353 (holding that factual disputes regarding circumstances of traffic stop were pertinent to deciding legal issues in motion to suppress, and thus hearing was necessary).

### B.

¶ 16. Of course, our conclusion that the trial court did not abuse its discretion in denying defendants' request for a hearing is somewhat intertwined with the merits of defendants' claims, which we now address. On appeal from denial of a motion to suppress, we defer to the trial court's factual findings and review its legal conclusions de novo. *Burnett*, 2013 VT 113, ¶ 14.

¶ 17. Defendants claim that the DataMaster DMT was not properly approved by the DOH Commissioner. The legal frame-

work regarding the DOH approval requirement is articulated in 23 V.S.A. § 1203(d), which provides in pertinent part:

> In the case of a breath test administered using an infrared breath testing instrument, the test shall be analyzed in compliance with rules adopted by the department of health. . . . Analysis of the person's breath or blood . . . shall be considered valid when performed according to methods approved by the department of health. The department of health shall use rule making procedures to select its method or methods.

¶ 18. Pursuant to this statutory mandate, the DOH promulgated a rule requiring that breath-alcohol "[a]nalyses shall be performed using the methods of gas chromatography or infrared spectrophotometry." Dep't of Health, Breath and Blood Alcohol Analysis, § C(I), Code of Vt. Rules 13 140 003, available at http://healthvermont.gov/regs/breath_bloodalcohol_analysis.pdf [hereinafter Breath & Blood Alcohol Analysis Regulation]. The rule set forth further performance requirements for the instrumentation employing these methods:

In using either method the following specifications must be met:

> 1. Sampling equipment shall be capable of collecting a sample of expired alveolar air. . . .

> 2. Analytical instrumentation shall be capable of analyzing replicate samples of breath containing a known amount of alcohol with a precision of plus or minus 5% from their mean when alcohol concentrations are reported to three significant figures.

> 3. Analytical instrumentation shall be capable of determining the blood or breath alcohol concentration of the person sampled with an accuracy of plus or minus 10%. The calculation of an equivalent blood alcohol concentration from the result of a breath alcohol analysis shall be based on a blood to breath alcohol concentration ratio of 2100:1.

> 4. Instrumentation shall be capable of determining the breath alcohol concentration of the person sampled within plus or minus 10% where the concentration is expressed as weight percent alcohol per 210 liters of expired air.

5. The analytical instrumentation shall be capable of detecting the presence of potentially interfering compounds which may be present in breath and which may otherwise interfere with accurate determination of an equivalent blood or breath alcohol concentration.

6. The analytical instrumentation and procedures used for analysis of breath alcohol content for evidentiary purposes shall be approved by the Commissioner of Health.

*Id.*

¶ 19. ▮ In *Rolfe*, this Court held that the DOH rules complied with the mandates of § 1203(d). 166 Vt. at 8-10, 686 A.2d at 955-56. Defendants contend on appeal, as they did before the trial court, that the DataMaster DMT was never approved by the Commissioner as required by paragraph 6 of the rule. Specifically, defendants argue that (1) letters from the Commissioner in 2006 and 2010 approving "the DataMaster using infrared technology" were not sufficiently specific to cover the DataMaster DMT because the technologies utilized in the BAC and DMT models were so distinctive as to require separate approval letters; (2) the 2006 approval letter could not have covered the DMT model because it was signed in February 2006 and the DOH did not even begin purchasing DMTs until May 2006; and (3) the 2010 letter was signed in September of that year, so even if the letter did cover the DMT, such approval was too late to apply at the time of defendant Harris's arrest in March 2010. Defendants further argue that even if the letters were sufficient to constitute an approval under the rule, the Commissioner did not engage in due diligence in issuing the approvals. In support of this claim, defendants point to an August 2010 letter from a state's attorney requesting that the Commissioner approve the DataMaster DMT for use in certain counties in the Northeast Kingdom in order "to avoid this technical challenge to the new equipment." The Commissioner responded by noting that "[w]ith respect to the new DataMaster equipment, the current form documents the Commissioner's approval of DataMaster instruments using infrared technology and covers the former and new equipment. Since you have expressed a concern, however, I am in the process of reissuing the approval form."

¶ 20. ▮ Defendants' claims boil down to whether the Commissioner's approval letters complied with the requirements of paragraph 6 of the DOH rule. This question implicates the DOH's interpretation of its own regulations. "We employ a deferential standard of review of an agency's interpretation of its own regulations," and the presumption that an agency's interpretation is valid "may be overcome only by compelling indications of error." *Conservation Law Found. v. Burke*, 162 Vt. 115, 121, 645 A.2d 495, 498 (1993); see also *Judicial Watch, Inc. v. State*, 2005 VT 108, ¶ 10, 179 Vt. 214, 892 A.2d 191 ("Absent compelling indications of error, interpretations of administrative regulations or statutes by the agency responsible for their execution will be sustained on appeal." (quotation omitted)). In interpreting regulations, our paramount goal "is to discern the intent of the drafters." *Burke*, 162 Vt. at 121, 645 A.2d at 499. We begin by referencing the plain meaning of the regulatory language, but "other tools of construction are available to us should the plain-meaning rule prove unavailing." *In re Williston Inn Grp.*, 2008 VT 47, ¶ 14, 183 Vt. 621, 949 A.2d 1073 (mem.).

¶ 21. ▮ Paragraph 6 of the DOH rule states that "[t]he analytical instrumentation and procedures used for analysis of breath alcohol content for evidentiary purposes shall be approved by the Commissioner of Health." Breath & Blood Analysis Regulation, § C(I)(6). Defendants contend that "instrumentation" refers to specific breath-alcohol machine models, and that the DMT and BAC models are so different as to require separate approval letters. However, the letters indicate that the Commissioner interpreted the term to refer to one or both of two types of instruments that perform the same function, one employing the gas-chromatography method, the other employing the infrared-spectrophotometry method. This broader interpretation of "instrumentation" does not require approval of specific models such as the BAC or DMT. Considering the instrumentation approval for breath-alcohol analysis in tandem with the instrumentation approval for blood-alcohol analysis, it becomes apparent that the broader interpretation is the correct one.

¶ 22. The Commissioner's approval letters going back to 1992 consistently approve of instrumentation using infrared spectrophotometry for breath-alcohol analysis, and expressly mention "DataMaster." Additionally, the 1992 and 1997 approval letters both also approve of instrumentation using gas chromatography

and expressly mention "GCI Intoximeter." In the 2004 letter, the Commissioner made no mention of instrumentation using the gas-chromatography method for "the analysis of breath alcohol for evidentiary purposes." Both the 2006 and 2010 letters state that "[t]he instrumentation approved for analysis of breath alcohol for evidentiary purposes is the DataMaster using infrared technology," and also omit gas chromatography as an approved method for breath-alcohol analysis.

¶ 23. The approval method for instrumentation for blood-alcohol analysis exists within the same legal framework as the approval method of breath-alcohol-analysis instrumentation. See 23 V.S.A. § 1203(d) ("Analysis of the person's breath *or blood* . . . shall be considered valid when performed according to methods approved by the department of health. . . . The department of health shall use rule making procedures to select its method or methods." (emphasis added)). Like the instrumentation for breath-alcohol analysis, "[a]nalytical instrumentation and analytical procedures [for blood alcohol] shall be approved by the Commissioner of Health." Breath & Blood Alcohol Analysis Regulation, § C(II)(4). In the 1992 approval letter from the Commissioner, the sentence immediately preceding the one approving breath-alcohol-analysis instrumentation reads, "For the analysis of blood alcohol for evidentiary purposes, I continue to approve the instrumentation of gas chromatography with flame ionization detection." The approval letters from 1997, 2004, 2006, and 2010 were less specific, omitting the phrase "with flame ionization detection." Including the letter from 1992, none of these letters expressly identify any specific instrumentation model; they do not even name an approved brand. In the context of blood-alcohol analysis, the Commissioner clearly interpreted "instrumentation" in a more general sense than the one for which defendants argue.

¶ 24. Any doubt about the Commissioner's view of the regulation would be resolved by the Commissioner's 2010 email to the state's attorney, which specifically stated that the approval letters pertain to "DataMaster instruments using infrared technology" and thus "cover[ ] the former and new equipment." This history suggests that the Commissioner did not view the rule as mandating greater specificity than naming a general class of instruments, such as those using infrared technology, although the letters usually went farther and named the DOH's chosen brand. The more general language used to approve instrumentation for blood-alcohol analy-

sis lends further support to a broader understanding of "instrumentation" as applied to approving the method to analyze breath-alcohol for evidentiary purposes.

¶ 25. ■ The DOH rule entrusts the approval of "analytical instrumentation and procedures used for analysis of breath alcohol content for evidentiary purposes" to the Commissioner. Breath & Blood Alcohol Analysis Regulation, § C(I)(6). We have reasoned that where the Commissioner is responsible for administering a statute or rule, "the Commissioner necessarily has developed expertise in this administration. As a result, we give deference to the Commissioner's interpretation . . . ." *Travelers Indem. Co. v. Wallis*, 2003 VT 103, ¶ 14, 176 Vt. 167, 845 A.2d 316; see also *Williston Inn*, 2008 VT 47, ¶¶ 13-16 (deferring to Commissioner of Taxes' interpretation of word "lease" in tax statute because interpretation was reasonable and did not undermine purpose of statute).

¶ 26. ■ Here, the rule does not contain a definition of the term "instrumentation." The rule does define "method," however, as "an analytical technique for performing chemical analyses," and states that "[a] method may require specific analytical instrumentation." Breath & Blood Alcohol Analysis Regulation, § B(I)(3). The rule goes on to identify gas chromatography and infrared spectrophotometry as the approved methods and explains the standards that the "analytical instrumentation" that uses those methods must meet in order to comply with the rule. Therefore, the rule's plain terms differentiate between "method" and "instrumentation." The distinction is logical. An "instrument" is a tangible device; a "method" is an intangible process.

¶ 27. ■ ■ We reject defendants' argument that "instrumentation" must refer to specific DataMaster models, such as the DMT or BAC. The Commissioner was reasonable in interpreting "instrumentation" to refer to a class of instruments rather than specific models. In fact, although the DOH approval letters do not name an approved brand for the gas chromatography method, the letters have consistently approved the DataMaster brand for the infrared spectrophotometry method. This interpretation that instrumentation may refer to a brand of machinery is consistent with the plain meaning of the word "instrumentation" as well as the statutory framework and our case law. The dictionary definition of "instrumentation" is "[t]he application or use of instru-

ments. . . . The study, development, and manufacture of instruments, as for scientific use." American Heritage College Dictionary 705 (3d ed. 1993). By contrast, "instrument" refers to "[a] device for recording, measuring, or controlling." *Id.* An instrument is designed to function in a certain way by employing a certain method. In selecting a certain method, one does not necessarily select a certain instrument, as any number of different instruments may employ the same method. Instrumentation, by contrast, concerns "the process of developing, manufacturing, and using instruments" more generally. Random House Kernerman Webster's College Dictionary (2010). The word refers to the type of machinery used and its functional processes, rather than the specific device or model.

¶ 28. ■■ ■■ We presume that the DOH chose the term "instrumentation" for a reason, and that had it intended an approach that would require approval of specific breath-alcohol-machine models, it would have chosen to articulate that requirement with the more fitting word "instrument." See *In re SP Land Co.*, 2011 VT 104, ¶ 23, 190 Vt. 418, 35 A.3d 1007 (explaining that courts "presum[e] that the drafters of the rules intended the plain and ordinary meaning of the language used in the rules"); *Slocum v. Dep't of Soc. Welfare*, 154 Vt. 474, 481, 580 A.2d 951, 956 (1990) (stating the "presumption that all language in a statute or regulation is inserted for a purpose"). Since the rule states that the Commissioner must approve "instrumentation," not "instruments," the Commissioner did not err in taking the more general approach mandated by rule.

¶ 29. ■■ Moreover, the Commissioner's approval of the DataMaster brand rather than a specific model accords with the intent of the Legislature for a more general approach that affords flexibility to the DOH in administering the statutory requirements. In *Rolfe*, we explained that the advantage of more general performance requirements "is that the rules are generic and do not have to anticipate the operation of many instruments that use infrared spectrophotometry to analyze breath samples." 166 Vt. at 8, 686 A.2d at 955. We went on to explain that "[t]he Legislature clearly intended a less specific approach for infrared testing by providing in § 1203(d) that a sample would be considered adequate if the infrared testing device did not reject it. Thus, it intended that the machine itself would find and indicate errors, obviating

the need to prevent errors by precisely regulating the breath-testing procedure." *Id.* at 8-9, 686 A.2d at 955. In other words, we concluded because the Legislature expected that the machines would be self-regulating, it decided to require a less hands-on regulatory approach. See *State v. Wells*, 172 Vt. 603, 606 & n.*, 779 A.2d 680, 683 & n.* (2001) (mem.) (upholding trial court's determination that DataMaster meets DOH performance standards based on DOH chemist's affidavit stating that "[t]he reporting of an alcohol concentration of a person's breath by the DataMaster is evidence that the instrument had successfully met all internal and external quality control reviews and had been operating properly at the time the breath sample was analyzed."). The Legislature's intent was thus properly effectuated by DOH's generic, noninstrument-specific implementing rules.

¶ 30. ▮ In *Rolfe*, we further clarified that the DOH rule's delegating authority to the Commissioner to approve the analytical instrumentation and procedures "follows from the choice . . . to adopt performance standards, which are not instrument-specific, and leave it to the commissioner to ensure that any machinery will meet the performance standards." 166 Vt. at 9, 686 A.2d at 955. On this basis, we upheld the delegation of performance standards to the Commissioner. *Id.* at 8-9, 686 A.2d at 955. In short, our decision in *Rolfe* interpreted the enabling statute, § 1203(d), to provide a "generic" approach to the performance standards, and concluded that the delegation of authority over performance standards to the Commissioner was also proper precisely because the standards are not "instrument-specific." Defendants' contention that the Commissioner's approval had to reach such heights of specificity as to approve of every model using infrared spectrophotometry is contrary to the statutory framework and our case law interpreting it.[5]

---

[5] Defendants' reliance on our decision in *State v. McQuillan*, 2003 VT 25, 175 Vt. 173, 825 A.2d 804, is misplaced. Although we described the regulations at issue in that case as providing that "the specific instruments and procedures for analysis of breath samples had to be approved by the Commissioner of Health," *id.* ¶ 5, we did not intend by that summary to undermine our reasoning in *Rolfe* that the performance standards contained in the regulations were intended to be noninstrument-specific. To the contrary, we explained in the same paragraph that the regulations "required certain methods of analysis for breath samples and established noninstrument-specific performance standards." *Id.* Considering that the word "instrumentation" is used consistently throughout the regulation, it would

¶ 31. Defendants assert that the Commissioner's letters were insufficient to comply with the DOH rule because the technology used in the DMT model is so distinctive from the BAC model that a separate approval letter was required for each model. For the reasons described above, defendants' arguments are inapposite. The interpretation of the term "instrumentation" as used in the DOH rule is not dependent on the differences or similarities between models based on their software, calibration techniques or other operating system differences; rather, it is based on the class of instruments that employs a particular type of technology — in this case the DataMaster brand.[6] Defendants do not dispute that both the BAC and DMT models are DataMaster machines that use the same basic technology. For similar reasons, defendants' arguments regarding the timing of the letters — that the 2006 letter was issued before the State purchased the DataMaster DMT machines and consequently did not cover them, and that the 2010 letter was too late to apply to defendant Harris — are not persuasive, as the Commissioner has consistently approved the "DataMaster using infrared technology" since 1992, and these approvals were sufficient to cover all DataMaster models, including the DMT.

¶ 32. Defendants further argue that even if the 2006 and 2010 approval letters covered the DataMaster DMT, the Commissioner engaged in little to no due diligence in issuing these approvals. Defendants primarily rely on their allegations that the devices experienced continuous malfunctions during the testing phase, leading a DOH chemist to recommend purchasing machines from a different company, and the Commissioner's 2010 email stating that she would issue an approval letter in response to a state's attorney's request. We dispose of defendants' latter allegation by noting that the Commissioner's response to the state's attorney did not reflect a lack of due diligence, as suggested by

make little sense to require the Commissioner to approve specific instruments under paragraph 6 when we have already determined that paragraphs two through five require a less specific approach.

[6] The trial court cited several secondary sources and decisions by other Vermont superior courts for the proposition that the DMT and BAC models are fundamentally similar. We need not evaluate the propriety of the court's analysis regarding the similarities and differences between the machines, because, in any event, the DOH rule requires approval of instrumentation at a higher level of abstraction than the specific models.

defendants, but rather her interpretation that the DOH rule did not require specific approval of the DataMaster DMT and, consequently, that prior approvals of the DataMaster generally covered the DMTs at issue. Defendants' insinuation that the Commissioner issued the 2010 approval letter in bad faith is unfounded.

¶ 33. ██ ██ As to defendants' former allegations, we reiterate our highly deferential standard of review of administrative actions, which we approach "with a gingerly step." *In re Agency of Admin.*, 141 Vt. 68, 74, 444 A.2d 1349, 1351 (1982). "Bathed in a singleness of concern and anointed with an aura of expertise, administrative actions have traditionally kept reviewing courts an arm's length away." *Id.* Of course, "we must endeavor to ensure that such deference does not result in unjust, unreasonable or absurd consequences," and "the presumption of validity for an agency's interpretations of its regulations may be overcome by the existence of compelling indications of error in such interpretations." *In re Verburg*, 159 Vt. 161, 165, 616 A.2d 237, 239 (1992) (quotations omitted). Here, the trial court found that the evidence showed that the DOH "conducted extensive testing of the DMT machine between 2005 and 2008, and eventually concluded that it met all of the Vermont performance standards." The trial court further found that successive DOH commissioners properly relied on the expertise of subordinates that were intimately familiar with the breath-alcohol testing machines and the testing process employed to ensure their reliability in the field. The trial court's conclusions are supported by the record, and we cannot say that the Commissioner's approval was exercised without due diligence.

*Affirmed.*