STATE OF VERMONT

| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 59-6-16 Vtec |
|---|---|
| Agency of Natural Resources,<br>　　　Petitioner<br><br>　　　　　　v.<br><br>Timberlake Associates, LLP,<br>Premium Petroleum, Inc.,<br>　　　Respondents | DECISION ON THE MERITS |

This matter arises out of the alleged release in 2012 of hazardous materials into surface water, groundwater and land of the state and the alleged failure to investigate, report or respond to a release or suspected release of hazardous material by Respondents Timberlake Associates, LLP and Premium Petroleum, Inc. (Respondents) on property at 375 North Main Street in Barre, Vermont. In a May 3, 2016 Administrative Order[1] (AO), the Vermont Agency of Natural Resources (ANR) alleges violations of the Vermont Waste Management law, 10 V.S.A. § 6616, and Underground Storage Tank (UST) Rules. The AO sets out factual allegations describing Respondents' prohibited release and failure to investigate, report or respond to the release. While the AO states that Respondents have largely remediated the release, ANR seeks administrative penalties of $85,000 for the violations. On July 1, 2016, Respondents requested a hearing on the AO with this Court.

The Court conducted a merits hearing at the Vermont Superior Court, Costello courthouse in Burlington, Vermont on May 17 and 18, 2017. Appearing at the trial were Randy J. Miller, II, Esq. and John Zaikowski, Esq. representing ANR and Tristram J. Coffin, Esq. representing Respondents.

Based upon the evidence presented at trial, the Court renders the following Findings of Fact and Conclusions of Law.

---

[1] The AO was filed with the Court on June 24, 2016.

1

**Findings of Fact**

1.      Wesco is a family-owned corporation which owns and operates 36 petroleum and mini-mart facilities in Vermont and New Hampshire.

2.      Wesco is a parent corporation.  Timberlake Associates, LLP and Premium Petroleum, Inc. are subsidiaries of Wesco.

3.      Wesco has approximately 120 USTs in service at their facilities.

4.      During November and December 2012, the Barre City Fire Department received complaints of petroleum smells in resident basements.

5.      Respondents were unaware of the complaints.

6.      While investigating the complaints on December 11, 2012, the Barre City Fire Department and ANR measured gas vapors in a sewer area accessed by a manhole in front of the North End Deli, one of Respondents' facilities.

7.       Vapors measured 17% of the Lower Explosive Level (LEL).  The vapors represented a danger of explosion, danger of human exposure in basements, and potential adverse impact to the City's wastewater treatment plant by killing treatment bacteria.

8.      On December 11, 2012, the Barre City Fire Department and ANR informed staff at the North End Deli of this situation and the neighbor complaints for the first time and requested to see the gas station's fuel records.

9.      Respondents cooperated with ANR to investigate the situation.

10.     On December 11, 2012, Respondents had a technician inspect the equipment at the North End Deli to determine if a release was occurring.  Upon inspection, Respondents determined that a flex hose in the Super Unleaded pump was leaking.  This part was located in the fuel dispenser. The leaking part was immediately replaced.

11.     Upon discovery, Respondents alerted the Fire Department and ANR of its findings.

12.     Respondents also immediately retained Environmental Compliance Services (ECS), an environmental consulting firm, to investigate and remediate the release.

13.     Respondents directed ECS to contain and remediate the release in a manner to protect public safety and the environment.

2

14. In response to the vapor issue in the city sewer system, on December 12, 2012, Respondents installed vacuum fans in the sewer and air purifies in area basements.

15. Respondents also completed test borings on December 13 and 14, 2012, and developed a multiphase extraction plan. Five (5) extraction wells were installed on December 14, 2012, and a vacuum truck was brought on-line on December 15, 2012.

16. Vapor concentrations in the area dropped quickly as the remedial plan was very successful.

17. The full groundwater extraction system was in place by January 5, 2013.

18. A majority of product was recovered within a few months of discovery of the release. This compares to more common remedial response time of greater than a year.

19. Overall, Respondents' remediation effort was very quick, resulting in minimal impact to human health and the environment.

20. Respondents also retained a plumber to work with neighboring properties to investigate odors and replace deficient plumbing in basements at properties in and around the North End Deli. This plumber replaced sewer gas traps where appropriate. This effort was paid for by Respondents with reimbursement from the Vermont Petroleum Clean-up Fund.

21. Respondents also placed air scrubbing units with blowers and vapor phase carbon filters in basements where petroleum vapors were of concern.

22. Upon remediation, the plume was very well-defined in a localized area. Almost no additional petroleum was recovered on further remediation.

23. Respondents recovered approximately 5,000 gals of extracted contaminated groundwater with the portable vacuum truck. Approximately 20 percent of this was product. Thus, 1,000 gallons of product was extracted from groundwater.

24. An additional 200 gallons of product was recovered through the remediation's oil/water separator.

25. A rough estimate from the amount of product recovered through the vapor recovery systems is 100 gallons.

26. ANR complemented ECS for its investigation and remediation.

27. Additional investigation determined that deficiencies in the City's sewage venting system contributed to the fumes detected in neighboring basements.

28. Respondents cooperated closely with the Agency, and after a substantial and costly effort at remediation, the release was found to be localized and was successfully remediated.

29. Although not required under state regulations, Respondents, or Wesco, installed containment sumps and tubs, as well as spill buckets, for secondary containment. Costs for this effort was $45,819.52.

30. The release resulted in minimal long-term impact to the environment. No product reached the city's wastewater treatment plant.

31. It is difficult to estimate the amount of product released.

32. Review of the fuel inventory records at the time of the release event revealed missing petroleum inventory.

33. Based upon the fuel inventory records, ANR estimates the amount of gasoline released to be more than 3,000 gallons. This estimate fails to account for vapors removed by the initial removal of vapors from the sewer.

34. Respondents estimate that 1,300 gallons of product was released, based on the estimated amount of product recovered by ECS.

35. Inventory reconcile discrepancies can happen without a release. Potential causes include accounting errors, mis-calibrated dispensing meters, split loads, fuel delivered to the incorrect UST, temperature variations, or UST tilt.

36. The release that occurred was not as large as alleged by ANR.

37. ANR alleges that Respondents were deficient in reporting inventory discrepancies, and failed to properly investigate those discrepancies.

38. Under the UST rules, gas stations must report inventory discrepancies when accounting shows a loss or gain of one percent of fuel throughput plus 130 gallons for two consecutive months.

39. In September 2012, Respondents reported that for July and August regular gasoline inventory was -684 gallons and -1131 gallons, and for super gasoline inventory was +684 and +836 respectively.

4

40. The pumps at the North End Deli blend regular and super to create a mid-grade fuel. At times, the pumps may increase the level of regular and decrease the level of super, or vice versa, into the blend, which creates an inventory discrepancy. In September 2012, Respondents investigated the systems and found no issues, concluding that a blending issue caused the discrepancies.

41. In October 2012, Respondents reported that for August and September regular gasoline inventory was -1131 gallons and -907 gallons, and for super gasoline inventory was +836 and +141 respectively.

42. The super inventory for October was not required to be reported because it did not exceed 130 gallons plus one percent of throughput, but Respondents reported none-the-less.

43. Respondents investigated the systems in November, prior to submitting the October report, and found no issues, concluding that the inventory variation was attributable to temperature and accounting issues. Respondents reported "the meters are true and all sumps are dry," indicating that the discrepancy was not a blending issue and that there were no leaks.

44. Respondents were not required to make a November report.

45. Respondents dispute that they were deficient in reporting inventory discrepancies to ANR.

46. For the past eight years Respondents and Wesco have always reported inventory discrepancies in any of their 120 USTs to ANR between the 21st and the 24th day of the month. Respondents submit discrepancy reports almost monthly because given the large number of gas stations they own, there is typically a discrepancy at one or more stations.

47. Along with the report, Respondents provide a synopsis of any investigation of the reported inventory discrepancy.

48. To generate a report, Respondents need to obtain invoices for product deliveries and also reconcile accounting of all product sales.

49. Respondents do not have the ability to report early in a given month.

50. ANR never advised Respondents that the reporting time was late or otherwise not in compliance with regulations.

51.     No Notice of Alleged Violation was issued for failure to report inventory discrepancies on time in 2012 or 2013.

52.     As of December 2012, Respondents had purchased the North End Deli relatively recently.

53.     Respondents dispensing equipment was in compliance with Vermont regulations, which grandfathered in systems of this nature.  Containment sumps under the gas dispensers were not required because the grandfathered status.   Containment sumps would have likely prevented any release to the environment.

54.     Breaking of fuel dispensers and hoses is commonplace in Vermont.

55.     Because the leaking hose was in the Super Unleaded pump, and because sales of Super Unleaded are minimal, it was difficult to detect or predict this leakage.

56.     Although a release occurred, the equipment was compliant with Agency rules and regulations.

57.     The fuel dispensing operation at the North End Deli was closed for a couple of months during the investigation and clean-up.  Thus, Respondents lost business during this period.

58.     ANR's cost of enforcement included approximately $3,328 of Environmental Enforcement Officer Daniel Mason's time; $3,909 of Environmental Program Manager, Sites Management, Matt Moran's time; and   $3,610 of Environmental Analyst, UST Program, Thomas Edward Unkles' time.

59.     Respondents have had two prior violations of 10 V.S.A § 8003 or related rules, permits, orders or assurances of discontinuance in the prior seven years.

**Penalty Assessment**

When a respondent requests a hearing on a penalty assessed in an AO, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent challenging the ANR order.  10 V.S.A. § 8012(b)(1), (4).  We therefore review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

ANR, and this Court in this proceeding, must consider seven factors when assessing a penalty:

(1) the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;

(2) the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;

(3) whether the respondent knew or had reason to know the violation existed;

(4) the respondent's record of compliance;

(5) [Repealed.]

(6) the deterrent effect of the penalty;

(7) the State's actual costs of enforcement; and

(8) the length of time the violation has existed.

10 V.S.A. § 8010(b)(1)–(8). The maximum penalty for each violation is $42,500, plus $17,000 for each day a violation continues. Id. § 8010(c)(1).

The State may also "recapture economic benefit" that the violator may have derived from the violation, up to the total maximum penalty allowed of $170,000. Id. § 8010(c)(2).

In an effort to standardize penalties and ensure a fair process, ANR enforcement officers use a form that is based on the seven factors. They rate the severity of the violations from 0 to 3 for factors (1), (3), (4) and (8), and come up with an initial penalty score. The highest possible initial score is a 15, which equates to an initial penalty of $42,500 for a Class I violation, the maximum allowed. Classes II, III, and IV carry lower maximum penalties of $30,000, $10,000 and $3,000 respectively. The initial penalty can then be adjusted based on penalty factors (2), (6) and (7). If the violator signs an Assurance of Discontinuance, agreeing not to dispute the action, the final penalty may be reduced by 25%.

At the outset of the Court's penalty assessment, we recognize that the Administrative Order at issue in this matter sets forth two violations: 1) the prohibited release of hazardous materials into the surface, groundwater and land of the state – 10 V.S.A. § 6616; and 2) the failure to investigate, report or respond to a release or suspected release of hazardous material – Underground Storage Tank (UST) Rules §§8-103(a)(2)(B) and 8-506(b)(2)(A). ANR has discretion to calculate and assess one penalty for events that result in more than one violation, or to calculate and assess a separate penalty for each violation stemming from the same activity. In the AO at issue, ANR calculates and assesses separate penalties for the two violations.

We first consider the appropriate penalty for the first violation, the prohibited release.

7

We conclude that this violation presents a Class I violation. A Class I violation includes violations which present a threat of substantial harm to the public health, safety, or welfare or to the environment. As detailed below, the release of gasoline caused a threat of substantial harm and we therefore classify the violation as Class I.

A.    Calculation of Base Penalty:

    a. *Penalty Factor 1: Actual or Potential Impact on Public Health, Safety, Welfare and the Environment*

Subsection (1) of 10 V.S.A. § 8010(b) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation."

There is credible evidence that the violation caused an "<u>actual</u> impact" that harmed the environment. ANR Administrative Penalty Form (ANR form) Questions 1 and 2. Gasoline was released into soil and groundwater. There is no credible evidence that the violation caused an "<u>actual</u> impact" that harmed public health, safety, or welfare.

Respondents' release of gasoline, however, had the potential to migrate to the nearby river and therefore resulted in a <u>potential</u> adverse impact on the environment. The release resulted in gasoline vapors accumulating in the City's sewer system and in the basements of nearby properties, causing the potential risk of human exposure to contaminates and/or explosion. Thus, we conclude that there was some potential adverse impact on public health, safety, or welfare.

In considering ANR's penalty calculation form, we assign a value of "2" to the degree of impact on public health, safely, and welfare (ANR form Question 1) as we conclude there was moderate actual impact or major potential impact from the release. We assign a value of "2" to the degree of impact on the environment (ANR form Question 2) as we conclude there was moderate actual impact to the environment from the release.

    b. *Penalty Factor 3: Whether the Respondent Knew or Had Reason to Know the Violation Existed*

Subsection (3) of 10 V.S.A. § 8010(b) requires consideration of "whether the respondent knew or had reason to know the violation existed." The ANR penalty calculation form includes

8

two parts related to this subsection: 3a, knowledge of the requirements, and 3b, knowledge of the facts of the violation. Respondents knew or should have known about their legal requirements under the Waste Management statute and the facts of the violation. 10 V.S.A § 6616 is only two sentences long and clearly states that the release of hazardous material to surface or groundwater is prohibited. Thus, in considering ANR's penalty calculation form, we assign a value of "1" for respondents' knowledge of requirements (ANR form Question 3a, which assigns a "1" where respondent "had reason to know about violated requirement"). As to Respondents' knowledge of the facts of the violations we assign a value of "1," concluding there is evidence that Respondents "should have reasonably known that the violation existed" (ANR form Question 3b). For instance, in September 2012, Respondents reported that for July and August regular gasoline inventory was -684 gallons and -1131 gallons and for super gasoline inventory was +684 and+836 respectively. In October 2012, Respondents reported that for August and September regular gasoline inventory was -1131 gallons and -907 gallons and for super gasoline inventory was +836 and +141 respectively. The super inventory for October was not required to be reported because it did not exceed 130 gallons plus one percent of throughput, but Respondents reported none-the-less. Although Respondents investigated the systems, found no issues, and concluded that inventory variation was attributable to temperature and accounting issues, these inventory discrepancies should have allowed Respondents to reasonably know of the release and therefore the violation.

c. *Penalty Factor 4: Respondent's Record of Compliance*

Subsection (4) of 10 V.S.A. § 8010(b) requires consideration of "the respondent's record of compliance." The evidence presented shows that Respondents had two previous violations of ANR's regulations. In considering ANR's penalty calculation from, we assign a value of "2" for this subsection (ANR form Question 4).

d. *Penalty Factor 8: Length of Time the Violation Existed*

Subsection (8) of 10 V.S.A. § 8010(b) requires consideration of "the length of time the violation has existed." Respondents testified that they were unaware of neighborhood complaint of gas odors until December 11, 2012. ANR offered evidence that the inventory records should have alerted Respondents that they had an on-going release from late summer through

9

December 2012. Respondents countered that they reviewed the inventory reports and investigated discrepancies, and based on this effort they were unware of releases.

At a minimum, Respondents were aware of the release during December 2012 and by spring 2013 the release was mostly remediated. Respondents promply fixed the faulty dispenser and promptly retained ECS to investigate and remediate the release. These events equate to a violation of short duration. In considering ANR's penalty calculation form, we assign a value of "1", concluding that this violation existed for a very short duration (ANR form Question 5).

In adding the above penalty scores we arrive at a base score of 8, which equates to a base penalty of $17,000 for a Class I violation. See ANR form Question 6.

B.    Penalty Adjustments:

We next consider appropriate adjustments to the base penalty.

e.   *Penalty Factor 2: Mitigating Circumstances*

Subsection (2) of 10 V.S.A. § 8010(b) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement." Although ANR completed a prompt site visit in response to the complaint of vapor concerns and associated potential release of product to the environmental, ANR waited from December 2012 until May 2016, or 3.5 years, to initiate enforcement proceedings. Furthermore, Respondents responded promptly and attempted to bring the subject property into compliance voluntarily. This evidence weighs heavily against the timeliness of ANR's actions.

Furthermore, Respondents promptly retained the services of ECS to investigate and remediate the release. ANR complemented ECS on the response and overall remediation. Respondents also hired and coordinated a plumber to improve plumbing at neighboring properties in response to the vapor issues. Lastly, Respondents voluntarily installed dispenser sumps and completed tank top upgrades, work that was not required, at a cost $45,819.52.

Based on these facts, the Court reduces Respondents' penalty based on mitigating circumstances in the amount of $5,000.

f.   *Penalty Factor 6: The Deterrent Effect*

Subsection (6) of 10 V.S.A. § 8010(b) requires consideration of "the deterrent effect of the penalty." The Secretary may increase the penalty amount up to the maximum allowed in the class of violation if the Secretary determines that a larger penalty is reasonably necessary to deter the respondent and the regulated community from committing future violations. Id. In this matter, the maximum penalty is $42,500 and the base penalty we have calculated is $17,000, allowing for a maximum deterrent of $25,500.

In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondents, we consider that Respondents were cooperative with ANR and the City of Barre Fire Department throughout the investigation and remediation of the release. Furthermore, we conclude that the short period of time that the violations existed, and Respondents' prompt and complete remediation of the release does not warrant a deterrent portion to be added to the initial base penalty.

g. *Penalty Factor 7: State's Actual Costs of Enforcement*

Subsection (7) of 10 V.S.A. § 8010(b) requires that we consider "the state's actual cost of enforcement." The value of the time that all ANR officials committed to responding to Respondent's violations, including prosecution of this matter, totals $ 10,847. We direct Respondents to reimburse these costs as an additional penalty for the violations.

h. *Economic Benefit*

The Secretary may recapture any economic benefit Respondents may have gained by violating its permit. 10 V.S.A. § 8010(c).

While we believe that recapturing economic gain from a violation is appropriate, we conclude that based on the evidence before the Court, we cannot calculate the gain in this matter. It appears based upon the evidence before the Court that Respondents did not realize a gain or economic benefit from the violations. Thus, we decline to impose any amount of additional penalty relating to economic gain.

i. *Reduction for Settlement*

Finally, ANR may reduce a respondent's penalty when the respondent admits the violation and enters an Assurance of Discontinuance fully resolving the compliance issue. Such a

reduction is not warranted in this matter, as Respondents did not resolve their dispute by settlement.

The Court therefore decreases the base penalty of $17,000 by subtracting mitigation for ANR's delay in initiating enforcement and Respondents' prompt investigation and remediation in the amount of $5,000, and adds $10,847 as reimbursement of ANR's costs of enforcement. The total penalty in this case is $22,847.

We next consider the second violation: Fuel Inventory Reporting under the UST Rules.

Section 8-506 of the UST Rules imposes release detection requirements for tank operators. 16-3 Vt. Code. R. § 203:8-506 (WL) (2017). As part of this, § 8-506(b) requires tanks owners to monitor inventory of USTs. The operator must record the volume of regulated substance in the tank at the beginning and end of each day, and the volume added to and removed from the tank each day. Id. § 8-506(b)(1)(A). Each month, the operator must evaluate these written records, compare the volume of regulated substances lost or gained during the period, and document this evaluation in writing. Id. § 8-506(b)(1)(F). For any two consecutive months, if the amount lost or gained is greater than one percent of the throughput plus 130 gallons, then a report to ANR is required "in accordance with [UST Rule] § 8-103(a)(2)(B)." Id. § 8-506(b)(2)(A). A report to ANR is also required "in accordance with [UST Rule] § 8-103(a)(2)(B)" any time there is "[a] sudden loss of regulated substance that, within 24 hours of the time the discrepancy is discovered cannot be attributed to circumstances other than a release." Id. § 8-506(b)(2)(B).

Section 8-103(a)(2)(B), in turn, requires an operator who suspects a release based on the fuel inventory and other factors to report that suspected release "immediately upon discovery." Reasons to report a suspected release include monitoring or testing results from § 8-506 that suggest a release may have occurred. Id. 8-103(a)(2)(B)(ii).

In September 2012, Respondents reported that for July and August regular gasoline inventory was -684 gallons and -1131 gallons and for super gasoline inventory was +684 and +836 respectively.

Respondents investigated the systems and found no issues, concluding that a blending issue caused the discrepancies.

In October 2012, Respondents reported that for August and September regular gasoline inventory was -1131 gallons and -907 gallons and for super gasoline inventory was +836 and +141 respectively. The super inventory for October was not required to be reported because it did not exceed 130 gallons plus one percent of throughput, but Respondents reported none-the-less.

Respondents investigated the systems and found no issues concluding that inventory variation was attributable to temperature and accounting issues.

Respondents were not required to make a November report.

As explained above, the UST Rules require an operator to report to ANR "immediately upon discovery" when the amount of fuel in a tank lost or gained is greater than one percent of the throughput plus 130 gallons for two consecutive months. UST Rule §§ 8-103(a)(2)(B), 8-506(b)(2)(A). ANR offers that Respondents' reports were not "immediate" and thus violated the UST Rules.

We read requirements set out in regulations according to the rules of statutory construction, and with the goal of discerning the intent of the drafters. In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621 (citations omitted). The UST Rules do not define "immediate," but the word is commonly understood to mean occurring at once, or instantly. Here, the Court found that Respondents need to obtain invoices for product deliveries and reconcile accounting of product sales before they can determine if there is a reportable loss or gain of fuel, and that they submit that report to ANR as soon as this information is available. Given that it presumably takes some time for a report to be compiled and sent, Respondent appears to have regularly reported gains and losses as near to immediately upon discovery as possible.

To the extent that the reporting requirement may be ambiguous, we give an agency's interpretation of its own regulations "substantial deference," unless that interpretation is "wholly irrational and unreasonable in relation to its intended purpose." In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 15, 17, 196 Vt. 467 (quotation omitted).

Respondents' practice over the eight years prior to this event was to make reports around the 20th to the 24th of the following month, as soon as they could assemble the inventory data. ANR never put Respondents on notice that this reporting was unacceptable or was required to be earlier in the month.

Interpreting the UST rules in this action to require earlier reporting of two-month losses or gains would be irrational and unreasonable. This interpretation is inconsistent with ANR's longstanding practice of accepting later reporting, a practice that suggests the later reporting complied with the Rules. Cf. Judicial Watch, Inc. v. State, 2005 VT 108, ¶ 9, 179 Vt. 214 (affirming agency interpretation of a statute that it is tasked to implement, in part because the interpretation was consistent with "longstanding practice"). By accepting later reporting on a regular basis in the past, ANR was effectively conceding that the later reporting complied with the UST Rules. In addition, by accepting the later reporting for a number of years and then suddenly determining that such reporting failed to comply with the UST Rules, ANR failed to provide "a reasonable opportunity to know what is" required by the Rules, or to "provide explicit standards for those who apply them." Sec'y, Vermont Agency of Nat. Res. v. Irish, 169 Vt. 407, 411 (1999) (quotation omitted).

We therefore conclude that Respondents are not liable for a violation of the UST Rules when required reporting was performed around the 20th to the 24th of the month following a required report.[2]

Furthermore, Respondents reported the suspected release immediately upon investigating and discovering the leaking flex hose on December 11, 2012. Respondents therefore complied with the requirement to immediately report "[a] sudden loss of regulated substance that, within 24 hours of the time the discrepancy is discovered cannot be attributed to circumstances other than a release." UST Rules § 8-506(b)(2)(B).

## Conclusion

For the reasons stated above, we conclude that for the violations at issue within the May 3, 2016 AO, Respondents shall be liable for a total penalty in these proceedings of **$22,847.00.**

## Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have

---

[2] If ANR wishes to require earlier reporting it should either clarify the UST Rules to better define "immediate" or put the regulated community on notice as to reporting expectations.

14

a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

Electronically signed on October 12, 2017 at 09:04 AM pursuant to V.R.E.F. 7(d).

*Tom Walsh*

_____

Thomas G. Walsh, Judge
Superior Court, Environmental Division