NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 83

No. 2019-280

Vermont National Telephone Company                    Supreme Court

                                                      On Appeal from
     v.                                               Superior Court, Washington Unit,
                                                      Civil Division

Department of Taxes                                   March Term, 2020


Mary Miles Teachout, J.

William R. Prescott and Timothy C. Doherty, Jr. of Downs Rachlin Martin PLLC, Burlington,
  and Henry P. Bubel and Tiffany N. Tam of Patterson Belknap Webb & Tyler LLP, New York,
  New York, for Plaintiff-Appellant.

Thomas J. Donovan, Jr. Attorney General, and Will S. Baker, Assistant Attorney General,
  Montpelier, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1.    **CARROLL, J.**    Vermont National Telephone Company (VNT) appeals the Commissioner of Taxes' determination that, pursuant to Department of Taxes Regulation § 1.5833-1, the capital gain VNT earned from the 2013 sale of two Federal Communications Commission (FCC) telecommunications licenses is subject to Vermont tax.[1]  VNT also argues that

---

[1]  Section 5862(d) of Title 32 provides that "[a] taxable corporation which is part of an affiliated group engaged in a unitary business shall file a group return containing the combined net income of the affiliated group."  At all times relevant to this appeal, VNT was part of a unitary group doing business in Vermont and elsewhere that included subsidiaries VTel Wireless, Inc., Four Winds Farm, Inc., and VTel Data Networks, Inc.  For purposes of this appeal, there is no need to distinguish between VNT and its subsidiaries, so we refer to them collectively as VNT.

the penalty the Commissioner assessed for VNT's failure to report the 2013 sale violated 32 V.S.A. § 3202(b)(3) and the Vermont and United States Constitution. We affirm.

¶ 2. Before turning to the facts, we briefly discuss the Department regulation governing this dispute. Regulation § 1.5833-1 governs the taxation of corporate income. It provides that business income shall be "apportioned" to Vermont to the extent the income "is derived from any trade, business or activity conducted" within the state. Allocation and apportionment of "Vermont net income" by corporations § 1.5833-1, Code of Vt. Rules 10 060 002(a)(1) [hereinafter Regulation § 1.5833], http://www.lexisnexis.com/hottopics/codeofvtrules. Nonbusiness income, however, is "allocated" in full to the state where the income-producing assets are "located" or have a "situs." Regulation § 1.5833-1(e). If the assets have neither a location nor a situs, the income is allocated to the state of the business's commercial domicile, which is defined as "the principle place from which the business is directed or managed." With that background, we turn to the facts of this dispute.

¶ 3. The following is undisputed. In 2003, the FCC auctioned licenses granting the right to broadcast in the 700 MHz frequency of the electromagnetic spectrum in specific geographic areas. The 700 MHz frequency was originally licensed for television broadcast. In the 1980s, however, the FCC decided to move television broadcasting to a lower portion of the spectrum and license the 700 MHz frequency for mobile telecommunications. By 2003, many television channels were still broadcasting at 700 MHz and it was unclear when they would stop operating at that spectrum, which was problematic because television operations at this frequency would interfere with mobile telecommunications.

¶ 4. Considering these uncertainties, VNT purchased two FCC licenses in 2003 for investment purposes. These licenses granted the company the exclusive right to broadcast over parts of upstate New York. License WPZW674, otherwise known as the "Albany license," covered a geographic area that included Albany, Troy, Schenectady, Amsterdam, and Saratoga

2

Springs. License WPZW676, otherwise known as the "Glens Falls license," covered Glens Falls, Whitehall, and Fort Ann. In 2010, the FCC granted VNT authorization to "carve out" a portion of the Glens Falls license to provide telecommunications service to approximately 1700 customers around Hebron, New York.

¶ 5. In 2013, VNT sold the Albany and Glens Falls licenses—excluding the "carve-out" area covering Hebron—to AT&T Mobility Spectrum LLC, resulting in a capital gain of approximately $23,970,730. Following the sale, VNT sought advice from its accounting firm about whether the sale would be subject to Vermont and/or New York tax. In a memorandum to VNT, the firm concluded that the gain would not be subject to Vermont tax. The firm explained that under Regulation § 1.5833-1, the capital gain would qualify as nonbusiness income. Because the Regulation directs nonbusiness income to be allocated to the state where the income-producing assets are located, the firm reasoned that the capital gain would be allocated to New York under the assumption that the licenses were located there. The memorandum expressly cautioned that:

> Any tax advice contained in this correspondence or attachments is based upon our understanding of relevant facts and the tax law and governmental rulings that were in effect at the time the advice was given. Furthermore, in accordance with [Internal Revenue Service] rules, we hereby advise you that any tax advice contained in this correspondence or attachments is not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

¶ 6. On its 2013 Vermont tax return, VNT—based on the advice of its accounting firm—reported the capital gain from sale of the licenses as nonbusiness income allocated entirely to a non-Vermont source. In 2015, the Department audited VNT and assessed corporate income

3

tax on the capital gain from the sale of the licenses,[2] $334,899 in interest, and an automatic underpayment penalty of $445,222.52. VNT appealed to the Commissioner.[3]

¶ 7. Before the Commissioner, VNT argued that the capital gain from the sale of the licenses was not subject to Vermont tax because the income-producing assets—the FCC licenses—were located in New York as "they convey benefits that can only be exercised in New York . . . and their value is inextricably bound to a host of geographic-specific factors in New York." Assuming, in the alternative, that the licenses had no location, VNT contended that the licenses would still not be subject to Vermont tax because VNT's commercial domicile was in Connecticut, not Vermont. VNT also argued the Department should not have assessed an automatic underpayment penalty because, given the complexity of the legal issues, VNT acted reasonably in allocating the gain from the sale of the licenses to New York.

¶ 8. In a lengthy written decision, the Commissioner affirmed the assessment of corporate income tax and the underpayment penalty. First, the Commissioner concluded that the FCC licenses were neither located nor had a situs in New York. The Commissioner reasoned that the geographic-specific factors VNT cited did not locate the licenses in New York because they were "all factors which may affect the unknown, but potential, future cost of acquiring infrastructure and future income in the event the licenses are used in New York business." That the licenses granted the right to broadcast in New York did not mean the licenses were located there because the broadcast areas "were simply market areas drawn on the map by the FCC."

---

[2] The Commissioner assessed corporate income tax in the amount of $1,947,437, which included unpaid tax on the capital gain from the sale of the licenses and unpaid tax on wages earned by VNT's president and CEO.

[3] See 32 V.S.A. § 5883 ("Upon receipt of a notice of deficiency . . . or of assessment of penalty . . . the taxpayer may . . . petition the Commissioner in writing for a determination of that deficiency . . . or assessment.").

4

¶ 9.     In determining that the licenses did not have a situs in New York, the Commissioner concluded that the term "situs" in Regulation § 1.5833-1 was a term of art referring to whether an asset is constitutionally subject to taxation in a state.  The Commissioner explained that due process requires some minimum connection between "a state and the person, property or transaction" it seeks to tax.  (Quotation omitted.)  Consistent with this rule, intangible property is generally subject to tax by the owner's state of domicile because intangible property is a source "of actual or potential wealth" that "cannot be dissociated from" its owner.  (Quotations omitted.)  Intangible property may, however, be subject to tax in a state other than the owner's domicile "if the owner engages in activities related to the intangible and those activities are subject to the taxing state's governmental protections and benefits."  In the latter case, the intangible acquires a "business situs" or "tax situs."  Based on these constitutional principles, the Commissioner determined that because VNT never engaged in activities related to the licenses in New York—e.g., did not charge or collect broadcast contract fees—the licenses did not acquire a tax situs there.

¶ 10.     Second, the Commissioner concluded that in 2012 and 2013, VNT's commercial domicile was in Vermont.  The Commissioner made extensive findings to support this conclusion, which were summarized as follows:

> Vermont was the location of the principal office, the place where high-level policy was implemented, where the conduct of day-to-day business operations occurred, where the greatest number of office staff and business employees worked, and where the business records were kept, and was the state that gave the greatest protection and benefits . . . .

¶ 11.     Finally, the Commissioner declined to abate the underpayment penalty because the structure of § 3202(b)(3) indicated that the Legislature "intended to create a penalty for simple failure to pay with no fault."  In addition, the Commissioner determined that the penalty was appropriate because one of the purposes of penalties was to encourage taxpayers to seek formal

5

guidance from the Department rather than take questionable tax positions. By failing to seek formal guidance, VNT "assumed the risk" of a penalty. VNT appealed to the trial court.

¶ 12.  At the trial court, VNT made three arguments. First, it argued that the licenses were "localized" in New York because it is the only place that granted the right to broadcast. Second, VNT argued that the Commissioner improperly considered "all the facts" in determining VNT's commercial domicile. Finally, VNT argued that the automatic penalty violated § 3202(b)(3)— because that section requires the Commissioner to exercise discretion in determining whether to assess a penalty—and was constitutionally excessive.

¶ 13.  Although the trial court affirmed the Commissioner's decision, it disagreed with some of his analysis and conclusions about where the FCC licenses were located. First, the trial court determined that the term "situs" in the Regulation was not being used as a term of art, such as tax situs or business situs. Instead, according to the trial court, the term simply meant location, which was the "parallel term expressly used in the first sentence" of Regulation § 1.5833-1. Applying this interpretation, the trial court determined that the licenses were not located in New York because the licenses had "no intrinsic location," and it distinguished between the business use of the licenses—which has a discernable location—and the licenses themselves—which do not.

¶ 14.  Second, the court concluded that the Commissioner properly weighed the relevant factors to determine that VNT's commercial domicile was in Vermont. Finally, with regard to the penalty, the court, quoting Piche v. Department of Taxes, 152 Vt. 229, 234, 565 A.2d 1283, 1286 (1989), held that the automatic penalty did not violate § 3202(b)(3) because the decision to impose automatic penalties "represents the full extent to which the Commissioner has chosen to exercise his discretionary authority as granted under the statute." The court also concluded that the penalty was not constitutionally excessive because it did not exceed the range of penalties permitted by § 3202(b)(3) and constituted only "a small percentage of the outstanding liability." VNT appealed.

6

¶ 15.    VNT makes similar arguments on appeal.  First, VNT argues that the licenses are located in New York because they convey "privileges that can only be exercised in a particular place"—namely, the right to broadcast in a defined geographic area and the corresponding right to deny others the ability to broadcast.  Second, assuming the licenses are not located in New York, VNT argues that its commercial domicile is in Connecticut because that is where the high-level decisions of officers and directors are made.  Finally, VNT submits that the Department's automatic penalty violates due process because the relevant statute requires the Department to conduct a "particularized inquiry into the considerations pertinent to a specific defendant." (Quotation omitted.)  Alternatively, VNT contends that the penalty violates the Excessive Fines Clauses of the Vermont and United States Constitutions.

## I.  Standard of Review

¶ 16.    Because Vermont does not have an intermediate appellate court, this case presents one of the rare circumstances where a party has the right to two appeals.  Section 5885 of Title 32 gives taxpayers the right to appeal the Commissioner's determination "concerning a notice of deficiency, an assessment of penalty or interest, or a claim of refund" to the superior court.  4 V.S.A. § 2, in turn, provides a right to appeal judgments of the superior court to this Court.  See State v. Phillip Morris USA Inc., 2008 VT 11, ¶ 9, 183 Vt. 176, 945 A.2d 887 ("Ordinarily, this Court is empowered to review, and litigants are entitled to appeal from, any final order of the superior court.").

¶ 17.    "Where there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal."  Tarrant v. Dep't of Taxes, 169 Vt. 189, 195, 733 A.2d 733, 738 (1999).  Although a trial court normally acts as a factfinder, it functions "solely as an appellate body" when reviewing the decisions of administrative bodies.  See In re Town of Shelburne, 154 Vt. 596, 603, 581 A.2d 274, 278 (1990).  Accordingly, we review the Commissioner's decision directly, "independent of the superior

7

court's findings and conclusions." Devers-Scott v. Office of Prof'l Reg., 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230.

## II. Tax Assessment

¶ 18.    The Commissioner held, pursuant to Regulation § 1.5833-1, that the capital gain from the sale of the licenses was subject to Vermont tax because the licenses had neither a location nor a situs, and VNT's commercial domicile was in Vermont.  VNT argues that the Commissioner erred in holding that the capital gain was subject to Vermont tax because (1) the licenses are located in New York; and (2) assuming the licenses have no location, VNT's commercial domicile is in Connecticut, not Vermont.

### A.  Location of FCC Licenses

¶ 19.    VNT argues that the licenses are localized in New York because they convey "privileges than can only be exercised in a particular place"—namely, the right to broadcast in a specific geographic area and the corresponding right to deny others the ability to broadcast. Regulation § 1.5833-1(a)(1) provides that business income shall be apportioned to Vermont based on the extent to which the income "is derived from any trade, business, or activity conducted" within the state.  Nonbusiness income, however, is allocated in full to the state where the income producing assets are "located" or have a "situs."  Regulation § 1.5833-1(e).  If the assets have neither a location nor a situs, the income is allocated to the business's commercial domicile.  Id.

¶ 20.    Here, there is no dispute that the sale of the licenses qualified as nonbusiness income.  The issue is whether the Commissioner erred in concluding that the income-producing assets—i.e., the licenses—were neither located in nor had a situs in New York.  The Commissioner concluded that the licenses did not have a location because intangible property, by definition, has no physical location, and the mere fact that the licenses conveyed rights that could be exercised in New York did not mean they were located there.  According to the Commissioner, the licenses

8

also did not acquire a New York situs because VNT never engaged in business activities with the licenses there, which means that VNT never availed itself of New York's laws.

¶ 21. VNT argues that in interpreting the Regulation, the Commissioner conflated "situs" with the concept of "nexus." According to VNT, whereas nexus is the "constitutional standard that considers the sufficiency of connections between a taxpayer and the state seeking to impose a tax," the term situs in Regulation § 1.5833-1 "simply asks where an asset is located for purposes of allocating nonbusiness income." Citing New York ex rel. Whitney v. Graves, 299 U.S. 366 (1937), VNT argues the FCC licenses are located in New York because they grant a right that can only be exercised there.

¶ 22. "We approach regulatory construction in the same manner as we do statutory interpretation." In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621, 949 A.2d 1073 (mem.). "[O]ur overall goal is to discern the intent of the drafters." Conservation Law Found. v. Burke, 162 Vt. 115, 121, 645 A.2d 495, 499 (1993). "[W]e do so by examining the plain meaning of the regulatory language, with other tools of construction should the plain meaning rule prove unavailing." In re Conservation Law Found., 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667 (quotation and alteration omitted).

¶ 23. However, because agencies, rather than the Legislature, draft regulations, "[w]e employ a deferential standard of review of an agency's interpretation of its own regulations." State v. Grenier, 2014 VT 121, ¶ 20, 198 Vt. 55, 110 A.3d 291 (quotation omitted). "Our deferential level of review, however, does not equate with mere judicial passivity . . . ." In re Wal-Mart Stores, Inc., 167 Vt. 75, 80, 702 A.2d 397, 400 (1997) (quotation omitted).

> We still conduct an independent review and will overturn an agency's interpretation of its own promulgated regulation that exceeds the authority granted under the state enabling statute, that conflicts with past agency interpretations of the same rule, that results in unjust, unreasonable, or absurd consequences, or that demonstrates compelling indications of error.

9

In re Conservation Law Found., 2018 VT 42, ¶ 16 (quotation and citations omitted).

¶ 24. Consistent with this deferential standard of review, we conclude that the Commissioner correctly determined that "situs" is a term of art referring to where intangible property is constitutionally subject to taxation. Applying this term of art, the Commissioner did not err in determining the licenses did not have a New York situs.

## 1. Situs

¶ 25. VNT first argues that the term "situs" in Regulation § 1.5833-1 is synonymous with location. We disagree. The Regulation's plain meaning, the presumption against superfluous language, and VNT's own argument indicate that situs is a term of art referring to where intangible property is constitutionally subject to taxation.

¶ 26. Beginning with the plain text, the Regulation, phrased slightly differently, directs nonbusiness income to be allocated to the state of a business's commercial domicile provided that the income-producing assets have neither a "location" nor a "situs." Regulation § 1.5833-1(e). It is a basic presumption of statutory interpretation "that language is inserted in a statute advisedly." Trombley v. Bellows Falls Union High Sch. Dist. No. 27, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993). We accordingly "construe statutes to avoid rendering one part mere surplusage." In re Jenness & Berrie, 2008 VT 117, ¶ 24, 185 Vt. 16, 968 A.2d 316.

¶ 27. Applying the presumption in this case, we must presume that the Department intended the words "location" and "situs" in the Regulation to carry different meanings. Otherwise, the parts of the Regulation referencing situs would be "mere surplusage." Id. This presumption is confirmed by the fact that "location" and "situs" have different meanings. Whereas "location" refers to a physical position, see Location, Black's Law Dictionary (11th ed. 2019), "situs" is "[t]he location or position (of something) for legal purposes," Situs, Black's Law Dictionary (11th ed. 2019). For taxation purposes specifically, "situs" is a term of art referring to where an intangible asset is constitutionally subject to taxation. See First Bank Stock Corp. v.

10

Minnesota, 301 U.S. 234, 237-38 (1937); Wheeling Steel Corp. v. Fox, 298 U.S. 193, 209-10 (1936).

¶ 28. "[D]ue process requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." Miller Bros. Co. v. Maryland, 347 U.S. 340, 344-45 (1954). A state's authority to tax is accordingly based on the "protection, opportunities and benefits [it] confers." Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 778 (1992) (quotation omitted). "The simple but controlling question is whether the state has given anything for which it can ask return." ASARCO Inc. v. Idaho State Tax Comm'n, 458 U.S 307, 315 (1982) (quotation omitted).

¶ 29. Based on these constitutional principles, tangible property is exclusively subject to tax "within the territorial jurisdiction of the taxing state," First Bank Stock Corp., 301 U.S. at 240, because the taxing state has provided "the benefit and protection of laws enabling the owner to enjoy the fruits of his ownership," Curry v. McCanless, 307 U.S. 359, 364-65 (1939) ("The power of government and its agencies to possess and to exclude others from possessing tangibles, and thus to exclude them from enjoying rights in tangibles located within its territory, affords adequate basis for an exclusive taxing jurisdiction.").

¶ 30. This rule, however, is "meaningless when applied to intangibles which, since they are without physical characteristics, can have no location in space." First Bank Stock Corp., 301 U.S. at 240; see also McCanless, 307 U.S. at 365 ("Very different considerations, both theoretical and practical, apply to the taxation of intangibles, that is, rights which are not related to physical things."). To determine where intangible property is subject to taxation, we indulge in a "metaphor," Graves, 299 U.S. at 372, and assign such property a fictionalized tax situs for the purpose of "symbolizing . . . those considerations which are persuasive grounds for deciding that a particular place is appropriate for the imposition of [a] tax." First Bank Stock Corp., 301 U.S. at 240-41; Wheeling Steel Corp., 298 U.S. at 209 ("[B]y reason of the absence of physical

11

characteristics [intangibles] have no situs in the physical sense, but have the situs attributable to them in legal conception.").

¶ 31.   Intangibles are generally subject to tax at the owner's domicile. Graves, 299 U.S. at 371-72; see also Wheeling Steel Corp., 298 U.S. at 209 ("[W]e have held that a state may properly apply the rule mobilia sequuntur personam and treat [intangibles] as localized at the owner's domicile for purposes of taxation."). This is so because intangible rights "are but relationships between persons, natural or corporate," and the power of government over them "can be made effective only through control over and protection afforded to those persons whose relationships are the origin of the rights." McCanless, 307 U.S. at 366.

¶ 32.   Despite "wide application" of the general principle that intangible property is subject to taxation at the owner's domicile, "an important exception has been recognized." Wheeling Steel Corp., 298 U.S. at 209. Intangibles acquire a business situs—"as distinguished from the legal domicil[e] of their owner," First Bank Stock Corp., 301 U.S. at 238—"when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there." McCanless, 307 U.S. at 367; Graves, 299 U.S. at 371-72 (recognizing that intangibles are "taxable only at the domicile of the owner" unless they have acquired a "business situs" elsewhere).

¶ 33.   By using the terms "location" and "situs" in Regulation § 1.5833-1, the Department clearly intended to distinguish between tangible and intangible assets and incorporate the above-mentioned constitutional principles to determine where nonbusiness income is subject to taxation. The Regulation directs nonbusiness income derived from tangible assets—i.e., assets with a location—to be allocated to the state where the assets are located because, constitutionally speaking, tangible property is exclusively subject to taxation at its location "within the territorial jurisdiction of the taxing state." First Bank Stock Corp., 301 U.S. at 240. The concept of location

12

is "meaningless," however, when considering where intangible assets are subject to taxation. Id. The Regulation accordingly introduces the concept of "situs" to determine where nonbusiness income derived from intangible assets is subject to taxation and incorporates the constitutional rule that intangibles are "taxable only at the domicile of the owner" unless they have acquired a situs elsewhere. Graves, 299 U.S. at 371-72.

¶ 34. This reading of the Regulation—that "situs" is a term of art referring to where intangible property is constitutionally subject to taxation—is the only way that, under the Regulation, nonbusiness income derived from intangible assets could ever be allocated to a state other than a business's commercial domicile, which is exactly the result that VNT advocates for. VNT argues the FCC licenses are allocated to New York, which is not the state of its commercial domicile. However, if—as VNT argues—the term situs in the Regulation is synonymous with location, then, under the Regulation, intangible assets would always be allocated to the state of commercial domicile because intangible assets, by definition, do not have a physical location. Wheeling Steel Corp., 298 U.S. at 209. Because the FCC licenses are intangible assets, and therefore have no location, the only way they could be allocated to New York is if they have acquired a situs there. Despite arguing that the word situs in the Regulation is synonymous with location, the result VNT seeks requires that situs be interpreted as a term of art.

## 2. Application

¶ 35. The remaining question is whether the Commissioner erred in concluding the FCC licenses did not have a situs in New York. The Commissioner reasoned that the licenses did not have a situs in New York because VNT never used the licenses in business activity there. That the licenses granted rights to broadcast in New York was also not sufficient to establish a situs because the broadcast areas "were simply market areas drawn on the map by the FCC."

¶ 36. Citing Graves, VNT argues that an intangible asset has a situs, regardless of any actual business use, if the asset grants a right that can only be exercised in a particular place.

13

Because the FCC licenses grant a right to broadcast in New York, VNT argues that the licenses have a situs there. Applying the deferential standard of review associated with an agency's interpretation of its own regulation, we conclude that VNT has not demonstrated that the Commissioner erred in concluding the FCC licenses did not have a New York situs.

¶ 37. It is certainly true that in Graves, the United States Supreme Court held that an intangible asset may have a situs, regardless of any business use, if the intangible grants a right that "is fixed exclusively or dominantly" at a particular place. 299 U.S. at 372-73. This statement, however, must be placed in context. To do so, we return to some basic principles about taxation. The concept of situs is a way of "symbolizing . . . those considerations which are persuasive grounds for deciding that a particular place is appropriate for the imposition of [a] tax." First Bank Stock Corp., 301 U.S. at 240-41. A state's ultimate power to tax is based on the "protection, opportunities and benefits [it] confers." Allied-Signal, Inc., 540 U.S. at 778 (quotation omitted). "The simple but controlling question is whether the state has given anything for which it can ask return." Idaho State Tax Comm'n, 458 U.S. at 315 (quotation omitted).

¶ 38. Consistent with these principles, in Graves, the United States Supreme Court recognized that an intangible asset may acquire a situs if either (1) the intangible is used in "the actual transactions of a localized business" or (2) the intangible grants a right that is "fixed exclusively or dominantly" at a particular place. 299 U.S. at 372. In the first instance, an intangible acquires a situs because the taxpayer has "extend[ed] his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there." McCanless, 307 U.S. at 367.

¶ 39. In the second instance, however, the intangible has a situs regardless of whether the intangible is actually used in business. Graves, 299 U.S. at 373 (explaining that "[t]he nature of th[e intangible] right is not altered by the failure to exercise it"). What is implied in the Court's

14

analysis in Graves is that the intangible has been created or protected by a state's laws. The intangible at issue in that case was a membership in the New York State Stock Exchange. In determining that the membership had a situs in New York regardless of any actual business use, the Court pointed out the multiple benefits that New York law had provided, explaining that the membership embraced:

> the privilege of a member to transact business on the Exchange as well as a valuable right of property which is the subject of transfer with the approval of the Exchange and may survive resignation, expulsion or death. In both aspects the right is held and can be exercised only in subjection to the constitution, by-laws and rules of the Exchange. The Exchange is a market place. The privilege which inheres in the membership is the right to conduct transactions at that market place. That privilege of conducting the business of the buying and selling of securities on the floor of the Exchange is the dominant feature of the membership or "seat."

Id. at 372-73 (footnote omitted). Graves and basic constitutional principles of taxation indicate that intangible assets can have a situs, regardless of any business use, if the right associated with the intangible is fixed in a particular place and that place's laws have provided protection and benefits. Again, "[t]he simple but controlling question is whether the state has given anything for which it can ask return." Idaho State Tax Comm'n, 458 U.S at 315.

¶ 40. Considering all of these principles, the Commissioner determined that the FCC licenses did not have a situs in New York by virtue of granting rights to broadcast there. Throughout his decision, the Commissioner explained that the FCC licenses granted rights that were created and protected by the FCC, not New York. Because the rights were created by the FCC, the Commissioner concluded that New York did not protect or benefit VNT's passive investment and, therefore, the licenses did not acquire a situs there. Given the deferential standard of review and the Commissioner's thorough reasoning as to why the FCC licenses did not have a situs in New York, VNT has failed to demonstrate any "compelling indications of error." In re Conservation Law Found., 2018 VT 42, ¶ 16 (quotation omitted).

15

## B. Commercial Domicile

¶ 41.    Because the FCC licenses have neither a location nor a situs, the capital gain from the sale of the licenses is allocated to VNT's commercial domicile.  Regulation § 1.5833-1(e).  The Commissioner concluded that the "true test" for commercial domicile is "to consider all the facts, to determine where the actual conduct of busines operations occurs, and which state gives the greatest protection and benefits to the corporation."  (Quotations omitted.)  Applying this test, the Commissioner concluded, based on extensive factual findings, that VNT's commercial domicile in 2012 and 2013 was in Vermont:

> Vermont was the location of the principal office, the place where high-level policy was implemented, where the conduct of day-to-day operations occurred, where  the greatest number of office staff and business employees worked, and where the business records were kept, and was the state that gave the greatest protection and benefits . . . .

¶ 42.    VNT does not challenge any of the Commissioner's factual findings on appeal.  Instead, VNT argues that the Commissioner improperly gave "equal weight" to "nonessential factors" in concluding that its commercial domicile was in Vermont.  Citing the United States Supreme Court's decision in Wheeling Steel Corp. v Fox., 298 U.S. 193 (1936), VNT argues that the most important factor is "the center of authority and control."  Applying this test, VNT argues its commercial domicile is in Connecticut because that is where its president makes "high-level strategic decisions" and the board of directors meets.

¶ 43.    As described above, supra, ¶ 23, "[w]e employ a deferential standard of review of an agency's interpretation of its own regulations."  Grenier, 2014 VT 121, ¶ 20.  We begin with some basic background principles on the concept of commercial domicile, which arose to address where intangible property owned by corporations should be taxed.  Intangible property is generally subject to tax at the owner's domicile.  Graves, 299 U.S. at 371-72.  Because "a corporation is deemed for most purposes to be domiciled in the state of its incorporation, intangibles are usually

16

taxable in that state." S. Pac. Co. v. McColgan, 156 P.2d 81, 93 (Cal. Dist. Ct. App. 1945). The rationale for this rule is that corporations generally carry on their business "in the state of incorporation and generally [have their] principal place of business there." Id. As such, "the corporation benefit[s] from the functions of government in respect to its activities generally, and in relation to its intangibles, more in that state than in any other." Id.

¶ 44. This rule, however, is based on a fiction, and in some circumstances, "[l]egal fiction should be made to yield to reality." Cargill, Inc. v. Spaeth, 10 N.W.2d 728, 733 (Minn. 1943). When a corporation "does not operate at its legal domicile," but "maintains in another state its principal business office, from which its management functions," the corporation is said to acquire a commercial domicile. Kevin Assocs., L.L.C. v. Crawford, 2003-0211, p. 9 (La. 1/30/04); 865 So. 2d 34, 40; see also Anniston Sportswear Corp. v. State, 151 So. 2d 778, 782 (Ala. 1963) ("[W]hen [a corporation] does not operate at its legal domicile and maintains in another state its principal business office . . . the latter place is considered as its 'commercial domicile.' "); Cargill, Inc., 10 N.W.2d at 733 ("A corporation may make its actual, as distinguished from its technically legal, home in a state other than that of its incorporation."). A corporation is subject to taxation at its commercial domicile because it is there that it receives the benefits provided by the government and may therefore "be required to pay its fair and just share of the cost of such benefits." Anniston Sportswear Corp., 151 So. 2d at 782.

¶ 45. With these background principles in mind, we turn to the question at issue here. What VNT disputes is the relevant test for determining where a corporation acquires a commercial domicile. It asserts that the dispositive factor is the location of high-level decision making and the Commissioner improperly weighed other less important factors. Under Regulation § 1.5833-1(e), commercial domicile is defined as "the principle [sic] place from which the business is directed or managed." The term commercial domicile was first defined in Wheeling Steel Corp. v. Fox. See Sinclair Pipe Line Co. v. State Comm'n of Revenue & Taxation, 339 P.2d 341, 344 (Kan. 1959)

17

("The matter of a commercial domicile of a corporation and the power to tax has been considered by the Supreme Court of the United States in several cases." (citing <u>Wheeling Steel Corp.</u>, 298 U.S. 193)); <u>N. Baton Rouge Dev. Co. v. Collector of Revenue</u>, 304 So. 2d 293, 297 (La. 1974) (explaining that commercial domicile "is generally understood as defined in <u>Wheeling Steel Corp. v. Fox</u>"); <u>Assoc'd P'ship I, Inc. v. Huddleston</u>, 889 S.W.2d 190, 198 (Tenn. 1994) ("The term, 'commercial domicile,' originated in the U.S. Supreme Court decision, <u>Wheeling Steel Corp. v. Fox</u>.").

¶ 46.   In <u>Wheeling Steel Corp.</u>, the United States Supreme Court held that a Delaware corporation had a commercial domicile in West Virginia. 298 U.S. at 211-12.  The Court explained that the corporation maintained "its general business offices" in West Virginia, which was where the corporation kept "its books and accounting records," directors held their meetings, and officers conducted "the affairs of the corporation."  <u>Id</u>. at 211.  The general business office was the corporation's "center of authority" that made it "the actual seat of its corporate government."  <u>Id</u>. at 212.

¶ 47.   In interpreting <u>Wheeling Steel Corp.</u>, courts have emphasized that the principal inquiry for commercial domicile is to consider where the business is managed and directed. <u>Memphis Nat. Gas Co. v. Beeler</u>, 315 U.S. 649, 652 (1942) (holding that corporation had commercial domicile in Tennessee because "[i]t manage[d] its business from its office" there); <u>S. Nat. Gas Corp. v. Alabama</u>, 301 U.S. 148, 153-54 (1937) (concluding that corporation's commercial domicile was in Alabama because the " 'entire management' was conducted from its principal office at the place"); <u>Anniston Sportswear Corp.</u>, 151 So. 2d at 782(explaining that commercial domicile is at company's "principal business office, from which its management functions"); <u>N. Baton Rouge Dev. Co.</u>, 304 So. 2d at 297 ("[T]he 'commercial domicile' exists where the principal place of business is located and from which the corporation's activities function and are managed." (quotation omitted)); <u>Assoc'd P'ship I, Inc.</u>, 889 S.W.2d at 198 ("[T]he

18

commercial domicile of a corporation is the place from which the business is managed or directed . . . .").

¶ 48.  To determine where a business is managed or directed, courts consider a variety of factors, including, but not limited to, where employees and officers work, where orders are received and fulfilled, where the books and bank accounts are located, and, of course, where the board of directors meets.  Memphis Nat. Gas Co., 315 U.S. at 652 (explaining that company managed business in Tennessee because that is "where it ke[pt] its accounts, provide[d] for the payroll of employees on its line in Tennessee and other states, and prepare[d] and sen[t] out bills for gas delivered in Tennessee and other states"); S. Nat. Gas Corp., 301 U.S. at 154 (explaining that management was conducted in Alabama because that is where company received and fulfilled orders); Assoc'd P'ship I, Inc., 889 S.W.2d at 198 (considering where officers and employees worked, management meetings were held, books kept, and bank accounts located).

¶ 49.  Where the board of directors meets is certainly a relevant factor in considering commercial domicile, but it is neither determinative nor does it carry more weight than any other factor.  Crawford, 865 So. 2d at 42 (explaining that location of board meetings "alone is not determinative of commercial domicile").  In fact, the notion that the location of the board of directors meetings is the most important factor runs counter to the basic concept of commercial domicile, which is to look beyond the "fiction" that a corporation is domiciled in its state of incorporation and instead require it "to pay its fair and just share of the costs of . . . benefits" provided in the state where it actually operates.  Anniston Sportswear Corp., 151 So. 2d at 782; see also S. Pac. Co., 156 P.2d at 99 ("[T]he contention that, as a matter of law the only state that can possibly be held to be its commercial domicile is that state where its board of directors meets, is as unrealistic, unsound, and artificial as the concept that the corporation for all tax purposes is domiciled in the state of incorporation.").

19

¶ 50. Considering the definition of commercial domicile, and the various precedents interpreting this term, the Commissioner did not err in concluding that VNT's commercial domicile was in Vermont. Consistent with this precedent, the Commissioner considered numerous factors to determine that VNT's commercial domicile was in Vermont because that is where it conducted business operations and received the most benefits. Specifically, the Commissioner found that VNT's day-to-day business was conducted out of its Springfield, Vermont office because at that office, the Chief Financial Officer, among other things, filed all of VNT's 2012 and 2013 Vermont non-income tax returns, paid sales tax, and paid payroll withholding tax. Most of the business records for the years 2012, 2013, and 2014—including sales records, financial statements, withholding-tax filings, W-2s and W-3s, and supporting work papers—were kept in the Springfield office. In 2012 and 2013, a majority of VNT's employees, fifty-seven out of fifty-nine, were subject to Vermont withholding tax, which meant that VNT had over fifty "employees in each year who were either resid[ing] in Vermont or working in Vermont." The Commissioner also noted that in its 2013 Connecticut corporate return, VNT affirmatively stated, under the penalty of perjury, that its principal place of business was in Vermont. By contrast, the Commissioner found that during those same years, VNT had no property in Connecticut, had no employees there, and did not store any business records there. Furthermore, the Commissioner found that the record was unclear as to "how many board meetings were held in Connecticut in 2012 and 2013." VNT does not challenge any of these findings.

### III. Penalty

¶ 51. The Department assessed an automatic penalty of $445,222 because VNT failed to report the gain from the 2013 sale of the FCC licenses and failed to pay taxes on a portion of its president and CEO's wages. VNT argues the automatic penalty violated due process because 32 V.S.A. § 3202(b) requires the Commissioner to exercise discretion on a case-by-case basis in

20

determining whether to impose a penalty. Alternatively, VNT argues that the penalty is constitutionally excessive.

## A. Section 3202(b)

¶ 52. Pursuant to § 3202(b)(3) and Department policy, the Commissioner imposed an automatic penalty of $445,222. The Commissioner declined to abate the penalty, explaining that although use of the word "may" in § 3202(b)(3) gives the Commissioner discretion to withhold the penalty on a case-by-case basis, "there were no circumstances here which warranted withholding the penalty."

¶ 53. On appeal, VNT argues the automatic penalty violated due process because in determining whether to assess a penalty, § 3202(b)(3) requires the Commissioner to exercise discretion on an individualized, case-by-case basis. By automatically imposing a penalty, VNT contends the Commissioner failed to exercise discretion as required by the statute. VNT contends that had the Department conducted an individualized review, the Department would not have penalized VNT because it adopted a reasonable construction of Regulation § 1.5833-1 in good faith based on the advice of accountants.

¶ 54. As a threshold matter, VNT's due-process argument is not preserved because it was not raised before the Commissioner. "We have repeatedly stressed that we will not address arguments not properly preserved for appeal." In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001). "[T]o properly preserve an issue, a party must present the issue to the administrative agency with specificity and clarity in a manner which gives the agency a fair opportunity to rule on it." Pratt v. Pallito, 2017 VT 22, ¶ 16, 204 Vt. 313, 167 A.3d 320 (quotation and alteration omitted). VNT argued before the Commissioner that the automatic penalty violated § 3202(b)(3). We accordingly only address VNT's assertion that the automatic penalty violated § 3202(b)(3) because the Commissioner failed to exercise discretion.

21

¶ 55. Moving to the merits, § 3202(b)(3) provides that the Commissioner "may" assess a penalty for a taxpayer's failure to pay a tax liability imposed by Title 32. The word "may" provides the Commissioner with discretion as to whether to assess a penalty. See Vt. Agency of Nat. Res. v. Duranleau Constr., Inc., 159 Vt. 233, 238, 617 A.2d 143, 146 (1992) (explaining that word "may" gave agency discretion). Because the decision to assess a penalty is a discretionary one, we review for an abuse of discretion. Hall v. Dep't of Soc. Welfare, 153 Vt. 479, 484, 572 A.2d 1342, 1345 (1990) ("This Court will not interfere with the performance of a discretionary duty in the absence of a showing of an abuse of discretion . . . ."). An agency's failure to exercise discretion is an abuse of discretion. Burbo v. Dep't of Soc. Welfare, 157 Vt. 664, 665, 599 A.2d 1045, 1046 (1991) (mem.) (holding that an agency's "refusal to exercise the discretion that its own regulation allow[ed was] an abuse of discretion").

¶ 56. We decided this exact issue in Piche v. Department of Taxes, 152 Vt. 229, 565 A.2d 1283 (1989). In that case, the Commissioner assessed an automatic penalty for a late tax return based on discretionary authority to assess penalties for late filing. Id. at 233, 565 A.2d at 1286. The trial court ruled that the automatic penalty was invalid because the Commissioner "violated his duty . . . to exercise discretion when imposing penalties for delinquent payment." Id. We reversed, explaining,

> The fact that the penalty was imposed automatically by the Department of Taxes when the delinquency was discovered does not negate the exercise of discretion on the part of the Commissioner, particularly when any penalty assessed is subject to individual review upon appeal to the Commissioner. It merely represents the full extent to which the Commissioner has chosen to exercise his discretionary authority as granted under the statute.

Id. at 234, 565 A.2d at 1286 (citation omitted).

¶ 57. Citing several other decisions from this Court, VNT argues that Piche was wrongly decided because, as a categorical rule, the exercise of discretion requires individualized consideration. This argument is incorrect. An agency's discretion is not always limited to

22

individualized consideration. "The enabling legislation of virtually every administrative agency must include a certain degree of discretion given to the administrative agency . . . ." <u>Vincent v. Vt. State Ret. Bd.</u>, 148 Vt. 531, 535, 536 A.2d 925, 928 (1987). "To determine the scope of authority vested in an administrative agency by a statutory grant of power, we look to its enabling legislation." <u>In re Mountain Top Inn & Resort</u>, 2020 VT 57, ¶ 37, __ Vt. ___, ___ A. 3d, ___ (quotation omitted).

¶ 58. The scope of an agency's discretionary authority varies depending on the enabling legislation. For example, the Legislature has given the Natural Resource Board the discretionary authority to promulgate regulations of general applicability. See, e.g., 10 V.S.A. § 6025(b) (providing Natural Resource Board with authority to "adopt substantive rules . . . that interpret and carry out the provisions of [Act 250]"). On the other hand, as VNT observes, in other situations we have held that agencies could not adopt rules of general applicability because the relevant enabling statute required an agency to exercise discretion on a case-by-case basis. For example, in <u>Martin v. State, Agency of Transportation Department of Motor Vehicles</u>, we held that the Department of Motor Vehicles could not adopt a regulation categorically excluding certain vanity license plates because the governing statute only gave the Department discretion to refuse requests for vanity plates on a case-by-case basis. 2003 VT 14, ¶¶ 2-3, 17-20, 175 Vt. 80, 819 A.2d 742.

¶ 59. Here, unlike the statute in <u>Martin</u>, nothing in § 3202(b)(3) indicates that the Commissioner is required to determine whether to assess a penalty on a case-by-case basis. Section 3202 provides the Commissioner with broad discretionary authority to assess penalties for the failure to pay taxes, the negligent failure to pay taxes, and the fraudulent failure to pay taxes. There is nothing that suggests the Commissioner must take individual circumstances into account beyond those general statutory criteria. As we explained in <u>Piche</u>, automatic penalties "merely represent[] the full extent to which the Commissioner has chosen to exercise his discretionary authority as granted under the statute." 152 Vt. at 234, 565 A.2d at 1286.

¶ 60. Furthermore, to the extent VNT argues that § 3202(b)(3) requires the Commissioner to consider penalties on a case-by-case basis, the appeal to the Commissioner as provided in § 5885 creates such individual review because, as we explained in Piche, "any penalty assessed is subject to individual review upon appeal to the Commissioner." 152 Vt. at 234, 565 A.2d at 1286. The record shows that the Commissioner specifically considered VNT's arguments and circumstances and did not abuse his discretion in determining that the automatic penalty was appropriate.

¶ 61. Before the Commissioner, VNT argued that given the complexity of the legal issues, it acted reasonably and in good faith by relying on the advice of its accountants and allocating the gain to New York. The Commissioner rejected this argument, reasoning that because § 3202(b) authorizes penalties for failure to pay, the negligent failure to pay, and the fraudulent failure to pay, the Legislature intended to penalize the failure to pay regardless of the taxpayer's fault or good faith. It is true that an abuse of discretion occurs when a decision is based on an incorrect interpretation of the law. Bratton v. Holland, 2018 VT 54, ¶ 17, 207 Vt. 517, 192 A.3d 1257. In this case, however, the Commissioner reasonably interpreted § 3202(b)(3). See Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215 ("Absent compelling indications of an error, interpretation of a statute by an administrative body responsible for its execution will be sustained on appeal, unless it is unjust or unreasonable." (quotation omitted)). In addition, the Commissioner determined that the penalty was appropriate because one of the purposes of penalties is to encourage taxpayers to seek formal guidance from the Department rather than take questionable positions.

B. Constitutionally Excessive

¶ 62. The United States Constitution prohibits excessive fines. U.S. Const. amend. VIII. The Vermont Constitution provides that "all fines shall be proportioned to the offenses." Vt. Const. ch. II, § 39. Citing United States v. Bajakajian, 524 U.S. 321 (1998), VNT argues the

24

$445,222 penalty is an excessive fine. The Department argues, however, that VNT failed to preserve this argument because it did not raise it before the Commissioner. We address VNT's Eighth Amendment claim on the merits even though VNT failed to raise it before the Commissioner. We conclude, however, that the penalty is not excessive.

### 1. Preservation

¶ 63. The Department argues that VNT failed to preserve its constitutional claim because it did not raise it before the Commissioner. VNT argues in response that the claim is preserved because there is "no daylight" between arguing that the penalty was arbitrary in violation of § 3202(b)(3) and arguing that the penalty is constitutionally excessive. Alternatively, VNT submits its constitutional claim falls within an exception to the preservation rule because the Department did not raise its preservation argument before the trial court, and the trial court addressed the claim on the merits. For the reasons articulated below, we will address VNT's Eighth Amendment claim.

¶ 64. "We have repeatedly stressed that we will not address arguments not properly preserved for appeal." White, 172 Vt. at 343, 779 A.2d at 1270. "[T]o properly preserve an issue, a party must present the issue to the administrative agency with specificity and clarity in a manner which gives the agency a fair opportunity to rule on it." Pratt, 2017 VT 22, ¶ 16 (quotation and alteration omitted); In re Morrisville Hydroelectric Project Water Quality, 2019 VT 84, ¶ 17, ___ Vt. ___, 224 A.3d 473 ("To preserve an argument for appeal, a party must present an argument with specificity and clarity." (quotation omitted)). Even constitutional claims are subject to the preservation rule. Clark v. Menard, 2018 VT 68, ¶ 6, 208 Vt. 11, 194 A.3d 752 (holding that petitioner failed to preserve constitutional argument because it was not raised with specificity below).

¶ 65. VNT did not preserve its constitutional argument. Contrary to VNT's assertion, there is a significant difference between a statutory claim and a constitutional one. VNT advanced

25

a purely statutory claim below, arguing that the penalty violated § 3202(b)(3). The Commissioner accordingly decided only whether the penalty imposed was consistent with the statute. Whether the penalty is constitutionally excessive is a completely different argument that had to be preserved. See Martin, 2003 VT 14, ¶ 11 (holding that constitutional argument was not preserved because appellant's argument throughout litigation was that regulation violated statute).

¶ 66. Nevertheless, in our discretion, we will address VNT's argument that the penalty violated the Eighth Amendment because the "goals of our preservation rules are satisfied" with respect to that claim. In re LaBerge NOV, 2016 VT 99, ¶ 16, 203 Vt. 98, 152 A.3d 1165; see also State v. Nash, 2019 VT 73, ¶ 15, ___ Vt. ___, 221 A.3d 386 (noting that Court has discretion to consider unpreserved issues). "The purpose of our preservation rule is to ensure that the original forum is given an opportunity to rule on an issue prior to our review." Vt. Built, Inc. v. Krolick, 2008 VT 131, ¶ 10, 185 Vt. 139, 969 A.2d 80 (quotation omitted). Preservation also "facilitates the development of a record for appeal." State v. Wool, 162 Vt. 342, 346, 648 A.2d 655, 658 (1994). Although VNT did not raise its constitutional claim before the Commissioner, it raised it with sufficient clarity to allow the trial court to address it. Both parties have briefed the Eighth Amendment claim on appeal. The goals of our preservation rule have therefore been met with respect to the Eighth Amendment claim, and we will address it.

¶ 67. The same cannot be said with respect to VNT's claim under the Vermont Constitution. On appeal, VNT makes a brief reference to the Vermont Constitution's Excessive Fines Clause. The trial court, however, decided only that the penalty did not violate the Eighth Amendment. Furthermore, "[m]erely citing the Vermont Constitution, without providing any analysis of how the state constitutional provision compares with its federal analog, does not adequately present the issue for our review." State v. Brillon, 2010 VT 25, ¶ 6, 187 Vt. 444, 995 A.2d 557.

## 2. Merits

¶ 68. The trial court concluded that the penalty did not violate the Eighth Amendment because the penalty was "a small percentage of the outstanding liability." The court also explained that civil tax penalties have repeatedly been held not to violate the Eighth Amendment's Excessive Fines Clause, and VNT cited no case in which a similar penalty was held to be constitutionally excessive. VNT argues the $445,222 penalty is constitutionally excessive because in Bajakajian, 524 U.S. at 337, the United States Supreme Court held that a $357,144 fine was excessive. The Department argues, on the other hand, that the penalty is proportionate to the underpayment, which was substantial.

¶ 69. The Eighth Amendment to the United States Constitution prohibits "excessive fines." U.S. Const. amend. VIII. In Timbs v. Indiana, the United States Supreme Court held that the Eighth Amendment's Excessive Fines Clause was applicable to the states through the Fourteenth Amendment's Due Process Clause. 139 S. Ct. 682, 689 (2019). "The Excessive Fines Clause . . . limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." Bajakajian, 524 U.S. at 328 (quotation omitted). A fine "violates the Excessive Fines Clause only if it is (1) punitive, and (2) grossly disproportional to the gravity of the defendant's offense." United States v. Jalaram, Inc., 599 F.3d 347, 351 (4th Cir. 2010).

### a. Punitive

¶ 70. A fine falls within the coverage of the Eighth Amendment's Excessive Fines Clause if it "constitute[s] punishment." Bajakajian, 524 U.S. at 328. Just because a fine serves both remedial and punitive purposes does not mean it is exempt from the Eighth Amendment's protections. Austin v. United States, 509 U.S. 602, 610 (1993). Rather, the inquiry is whether the fine "can only be explained as serving in part to punish." Id.

¶ 71. In this case, the Department's penalty undoubtedly constitutes punishment. As we explained in TD Banknorth, N.A. v. Department of Taxes, § 3202 enables "the Commissioner to

27

penalize taxpayers when they have not properly discharged their tax burden" by assessing a penalty based on the outstanding tax liability. 2008 VT 120, ¶ 37, 185 Vt. 45, 967 A.2d 1148 (emphasis added). As such, a penalty assessed pursuant to § 3202 "does not serve the remedial purpose of compensating the Government for a loss." Bajakajian, 524 U.S. at 329. While § 3203 allows the Commissioner to recover any underpaid taxes, § 3202 allows the Commissioner to assess a penalty in addition to the outstanding tax liability. The purpose of § 3202 is to penalize taxpayers and, in doing so, allows the state to recover an amount in excess of the outstanding tax liability.

### b. Excessive

¶ 72.   "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian, 524 U.S. at 334. A penalty accordingly violates the Excessive Fines Clause if it is grossly disproportionate. Id. at 336 (adopting the "standard of gross disproportionality articulated in . . . Cruel and Unusual Punishments Clause precedents"). Because "the relevant constitutional line is inherently imprecise," each case requires "an independent examination." Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 434-35 (2001). Some of the relevant factors to consider include the degree of culpability, the relationship between the penalty and the harm, and "the sanctions imposed in other cases for comparable misconduct." Id. at 435.

¶ 73.   As an initial matter, "judgments about the appropriate punishment . . . belong in the first instance to the legislature." Bajakajian, 524 U.S. at 336. There is accordingly "a strong presumption that the amount of a fine is not unconstitutionally excessive if it lies within the range of fines prescribed by the legislature." Moustakis v. City of Fort Lauderdale, 338 F. App'x 820, 821 (11th Cir. 2009) (quotation omitted). In this case, the penalty the Commissioner assessed fell within the statutory range prescribed by the Vermont Legislature. Section 3202(b)(3) provides that if a "taxpayer fails to pay a tax liability imposed by . . . [T]itle [32]," the Commissioner may

28

assess a penalty of "five percent[] of the outstanding tax liability for each month, or portion thereof, that the tax liability is not paid in full; provided, however, that in no event shall the amount of any penalty assessed . . . exceed 25 percent of the tax liability unpaid." But see 32 V.S.A. § 3202(b)(3) (providing that for income tax, the Commissioner can only assess penalty equal to one percent of the outstanding tax liability). Pursuant to § 3202(b)(3), the Commissioner assessed a penalty of $445,222.52, which was approximately twenty-three percent of the outstanding tax liability. Because the penalty assessed fell with the statutory range, a strong presumption exists that the penalty is not constitutionally excessive.

¶ 74. The relevant factors outlined in Cooper Industries, Inc., confirm that the penalty imposed here is not unconstitutionally excessive. With regard to culpability, VNT argues its conduct was not culpable because VNT relied on the advice of its accounting firm, and it was never alleged they willfully or negligently underpaid. Although VNT may have relied upon the advice of its accounting firm, the memorandum VNT received from its accounting firm was just that—advice. The memorandum expressly cautioned that "[a]ny tax advice contained in this correspondence or attachments is based on upon our understanding of relevant facts and the tax law and governmental rulings that were in effect at the time the advice was given" and could not be used "for the purpose of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service." Despite receiving this cautionary advice, VNT did not seek a formal ruling from the Department. See Organization and Rules of Procedure Rule 7(b), Code of Vt. Rules 10 060 028, http://www.lexisnexis.com/hottopics/codeofvtrules ("Upon request of a taxpayer, the Department will issue a declaratory ruling to as to the applicability of any statutory provision or of any rule or practice of the Department."). Although VNT may not have willfully or intentionally underpaid, by relying on the advice of its accountants and not seeking a formal ruling, it—as the Commissioner explained— "assumed the risk" of receiving a penalty.

¶ 75.    With regard to "the sanctions imposed in other cases for comparable misconduct," Cooper Indus., Inc., 532 U.S. at 435, VNT argues the $445,222 penalty is constitutionally excessive because in Bajakajian, 524 U.S. at 337, the United States Supreme Court held that a $357,144 fine was excessive.  In Bajakajian, the defendant was found guilty of failing to report, as required by federal law, that he was transporting $357,144 in cash, and the trial court determined the entire amount was subject to forfeiture.  Id. at 324-25.  The United States Supreme Court held that the forfeiture was an excessive fine because the crime "was solely a reporting offense," and the forfeiture order was "many orders of magnitude" larger than the maximum $5000 fine for the offense under the sentencing guidelines.  Id. at 337-38, 340.  The Court also noted that the harm to the government was minimal because "[h]ad his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country."  Id. at 339.

¶ 76.    Nothing about Bajakajian indicates that the Commissioner's twenty-three percent penalty in this case was excessive.  Unlike Bajakajian, the $445,222 penalty the Commissioner assessed was not "many orders of magnitude" larger than the unpaid tax liability.  Furthermore, in contrast to Bajakajian, the present case involved significantly more harm to the government because VNT initially failed to pay a tax liability of $1,947,437.  Based on the foregoing, we conclude the penalty is not constitutionally excessive.

Affirmed.

FOR THE COURT:

_____
Associate Justice